**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals
**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued July 6, 2005
Decided August 26, 2005

**Before**

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. KENNETH F. RIPPLE, *Circuit Judge*

Hon. ILANA DIAMOND ROVNER, *Circuit Judge*

No. 04–2048

| | |
|---|---|
| IVAN LOLI, et al., | On Petition for Review of an Order of |
| *Petitioners*, | the Board of Immigration Appeals |
| | |
| *v.* | Nos.   A79 263 070, A79 263 071, |
| | A79 263 072 |
| ALBERTO GONZALES, | |
| *Respondent*. | |

**O R D E R**

Dr. Ivan Loli, who was a state archivist in Albania, petitions for review of an order of the Board of Immigration Appeals denying his application for asylum.  After Loli had several run-ins with less than desirable Albanians, including one incident in which his teenage son was briefly abducted, he fled to the United States, where he overstayed his visa and was charged as removable.  Loli applied for asylum on behalf of himself and his family, claiming he had been persecuted because of his political opinion and nationality.  The IJ denied the application and the BIA affirmed in a separate opinion, finding that Loli was not credible.  He now petitions for review of that decision.  We deny the petition.

Throughout the 1990s, Loli used his position as an inspector for the state archives to make known documents exposing the true nature of the former communist government.  For this—as well as his Greek ethnicity and activism on behalf of the opposition Democratic Party ("DP")—he fell afoul of the communists'

heirs, the Socialist Party ("SP").  At an immigration hearing, he described a number of different episodes of mistreatment, but the level of detail he provided varies widely.  As we read the record, there are six major incidents to recount.

The first stems from Loli's successful lobbying in 1992 for the passage of a law ordering the transfer to the state archives of a cache of communist documents under the SP's control.  On the day that Albania's supreme court upheld the law against a constitutional challenge by the SP, Mrs. Loli found under her door an anonymous letter that said, "give up digging in the documents, you dirty Greek, and dirty *cub* [no translation provided] of the Democratic Party . . . we will root you and your family out."  The following evening as Dr. Loli was returning home from work, he was attacked by three violent men who pulled up in a jeep; they said, "Let's strangle this Democratic Party's S.O.B., this Greek puppet," and beat him unconscious.  Loli regained consciousness in the building housing the office of the regional prosecutor, near the archives, but he decided not to file any charges nor to seek medical treatment.

In the second incident, in 1993, Loli was imprisoned for seven days on charges of collaborating with the secret service of Greece.  He testified that he had been visiting Greece when his supervisor at the state archives, the general director, was caught attempting to smuggle documents from Albania to France.  When officials learned that he had been out of the country, he likewise became suspect. He was arrested at his home by four policemen, who took him to Tirana Prison, where he was fed only bread and water. While in prison, he was pistol-whipped, and guards repeatedly kicked him and struck him in his back and neck.  Upon his release Loli sought no treatment because he knew that his "muscles will recover," but he was traumatized by the incident and reported it to DP headquarters.

The third, and most serious, occurrence stems from a major discovery made in June 1995 by Loli and a colleague at the archives: they unearthed documents— which the interior minister had attempted to destroy in 1990 and '91—implicating the communist party in the execution of some 80,000 Albanians.  In a television interview, Loli and the other inspector accused the government of illegally concealing the records, and over the following days several newspapers reported the charge.  A week after the interview Loli's son Gent, who was thirteen at the time, was abducted by unidentified thugs.  In an affidavit, Gent asserted that he was walking home in the evening when a car pulled up and two men got out and struck him with bats—one hitting him in the knee, the other in the head—knocking him unconscious.  Gent woke up "in a dark, filthy, small room" and saw blood on his pants.  He also noticed when he touched his head that his "hair was wet from blood."  His captors told Gent that he would "pay for [his] father's actions," and instructed him to tell his father "not to mess with the government," threatening to kill Dr. Loli if he continued disparaging the communists.  Gent was released after two days.  His parents took him to a hospital for x-rays and thereafter arranged for

a nurse friend to treat him at home.  The nurse's affidavit confirms Gent's account that she visited him and supplied medication for his injuries.

The record provides comparatively little detail about the remaining incidents. The fourth also involves Gent.  Loli, who viewed his work exposing communist malfeasance as an extension of his activism on behalf of the DP, campaigned for a DP candidate in the watershed elections of 1997, in which the SP won power. Shortly thereafter, while leaving school, Gent was arrested by police officers for "disturbing the peace."  He was held for roughly five hours, and when Loli arrived to pick him up, the officers warned him to "be careful because anything can happen."

In the fifth incident Loli was arrested by police officers in November 1998 and again in December on suspicion of helping to organize the riots that accompanied the funeral of slain DP leader Azem Hajdari.  Loli was held for a day each time and was pressed to admit that he played a role in the violence.  During the first interrogation, he "was punched a couple times," and during the second, officers tried "with much more force" to make him confess, although he did not indicate what that means.

Finally, in late 1999 after Loli publicly protested against the general director's decision to return communist-era documents to the SP government's foreign ministry, police officers searched his home for weapons and he was attacked in a store while Christmas shopping.  The officers justified the search with a warrant.  No one was injured and there was no damage.  His attack in the store was perpetrated by three assailants who punched Loli, knocking him down, and called him a "bad Greek" and a "supporter of Genc [P]ollo," a prominent Democrat.  By this time, Loli testified, all of the "attention and pressure" brought about by his DP activities and work in the archives was too great, and he decided to flee to America.

After the hearing, the IJ denied asylum, finding that Loli was not credible because he had been able to keep his employment with the government, earn a doctorate degree, and teach as an adjunct professor during the period in question. The IJ also observed that, according to the INS document inspector, Loli had submitted fabricated documents: a DP party card and a court summons issued after he had left Albania.  The IJ credited the inspector's report, which stated that the ID card "is easily obtained, has no security features and lists no payment of dues," and pointed out that the summons was written without diacritics (accent marks) and in a typeface typical of American, rather than European, typewriters.   The IJ also denied voluntary departure.

The BIA affirmed in a separate opinion.  The Board agreed that Loli was not credible because he had submitted fraudulent documents, and because he had maintained his position in the archives and managed to complete his degree. However, the Board reversed the IJ's denial of voluntary departure.  Because the

Board issued its own opinion rather than adopting the IJ's order, we review the Board's decision. *Prela v. Ashcroft*, 394 F.3d 515, 518 (7th Cir. 2005); *Liu v. Ashcroft*, 380 F.3d 307, 311–12 (7th Cir. 2004).

In this petition Loli challenges both bases for the Board's adverse credibility finding. He initially attacks the BIA's reliance on the INS inspector's report in concluding that the DP membership card was fabricated, faulting the Board for refusing to credit his explanation for perceived irregularities with the document.

This court defers to the credibility determinations of the BIA so long as they are supported by specific, cogent reasons that bear a legitimate nexus to the finding. *Huang v. Gonzales*, 403 F.3d 945, 948 (7th Cir. 2005); *Ahmad v. INS*, 163 F.3d 457, 461 (7th Cir. 1999). When the Board finds a discrepancy or inconsistency that could discredit an asylum applicant, the applicant must convincingly explain the discrepancy or else supply extrinsic corroborating evidence. *Capric v. Ashcroft*, 355 F.3d 1075, 1086 (7th Cir. 2004).

Loli's attempt to prove the validity of his party ID card is not so convincing that the Board had to accept it. Loli testified that the card does not show his past payment of membership dues—a regular feature of DP membership cards, according to the INS inspector—because he lost his old card and obtained this replacement in October 1999, shortly before leaving Albania. This explanation only responds to one of the INS inspector's concerns about the card; the inspector also noted that the card bore no security features, such as a signature or fingerprint. Moreover, Loli's argument would have been much more effective had he countered the inspector's findings with an opinion by a document inspector of his own. Instead he produced as an expert witness Bernard Fischer, a professor of Balkan and Albanian history; although Dr. Fischer challenged the INS inspector's findings, the IJ pointed out that he is not qualified as an expert in document authentication.

Similarly, Loli failed to provide a convincing explanation for the irregularities with the court summons. He contends that the inspector's conclusion that the summons is merely "fabricated" rather than "counterfeit" or "fraudulent" leaves him some wiggle room: according to the inspector, "fabricated" means that "it's not necessarily a counterfeit document, but the use of the document and the authenticity or authority of issuance [is] in severe question." This is a weak argument indeed. A glimmer of doubt in the inspector's conclusion falls far short of evidence that would *compel* us to reverse the Board's decision. Loli also argues that the INS inspector was not properly certified as an expert, and that under *Kourski v. Ashcroft*, 355 F.3d 1038, 1039 (7th Cir. 2004), Loli cannot be discredited for using the summons because it was mailed to him and he did not know that it was fabricated. He failed to raise either of these arguments before the Board, however, and they are therefore forfeited. *See Tapia v. Ashcroft*, 351 F.3d 795, 797 n.3 (7th Cir. 2003).

Loli also challenges the BIA's other basis for the credibility finding—his ability to keep his job and earn a doctorate despite his ordeal.  He argues that this has "little bearing on his case for asylum."  To the contrary, courts have held that staying in the country for a significant time after being mistreated and completing an advanced degree undercuts a finding of persecution.  *See Kondakova v. Ashcroft*, 383 F.3d 792, 797 (8th Cir. 2004); *cf. Ambati v. Reno*, 233 F.3d 1054, 1061 (7th Cir. 2000).  The Board was permitted to conclude that Loli's decision to stay in Albania for over five years after his son was kidnapped—and seven years after his own imprisonment and beating—was incongruous with his claim that he seriously feared persecution.

Loli also challenges the Board's determination that the mistreatment he suffered was not "on account of" his political opinion or nationality, but as the government notes, since we affirm the Board's credibility finding, there is no need to reach this issue.  The petition for review is DENIED.