# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-4009

XIU PING HUANG,

*Petitioner*,

v.

ALBERTO GONZALES, Attorney General
of the United States,[1]

*Respondent*.

_____

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A77-322-383

_____

ARGUED DECEMBER 15, 2004—DECIDED APRIL 14, 2005

_____

Before KANNE, WOOD, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Chinese citizen Xiu Ping Huang applied for asylum, claiming that she would be persecuted because of her membership in an illegal Catholic church if she returned to China. An immigration judge denied Huang's application after a hearing because he found that she was not credible and had failed to corroborate her tes-

_____

[1] We substitute Attorney General Alberto Gonzales for his predecessor, John Ashcroft.

timony, even though the judge acknowledged that members of underground Catholic churches in China face widespread persecution. During the hearing, however, the immigration judge repeatedly interrupted the examination conducted by Huang's attorney and questioned Huang extensively about her Catholic beliefs and practices. In discrediting Huang, the immigration judge relied heavily on what he thought were unsatisfactory answers to his questions—all of which were based on information outside of the record. Our concerns about the judge's conduct during the hearing lead us to conclude that his decision is not supported by substantial evidence and, accordingly, we grant Huang's petition for review.

## I. BACKGROUND

Huang arrived in September 2000 at Los Angeles International Airport without proper documents to enter the United States. She was sixteen years old at the time. Huang was interviewed at the airport and said that she had come to the United States because "I want to live here and hopefully, find a job." Officials refused her entry into the country and detained her for five months. At a hearing before an immigration judge in San Francisco shortly after her arrival, Huang said that she intended to seek asylum because she feared she would be persecuted on account of her religion if she returned to China. Huang then retained an attorney and applied for asylum. She subsequently moved to the Chicago area and was granted a change of venue. A new immigration judge denied her application after a hearing in July 2002. The Board of Immigration Appeals (BIA) affirmed without an opinion.

At the hearing, Huang testified that in 1997 she and her parents became active in an underground Catholic church in Changle, a city in China's Fujian province. She explained that the Chinese government allows Catholics to worship

only at a single officially sanctioned church, which denounces the authority of the Pope, so many Chinese Catholics instead worship in illegal underground churches. Huang's church had about 15 worshippers, met in a neighbor's home, and was led by her father and another member of the congregation. The church held mass when it could, but its priest was not always available. In addition to mass, the church members met for scripture readings and Bible study.

Huang testified that officials at her junior high school in December 1998 discovered a rosary in her purse. Once the school learned of her Catholic beliefs, she said teachers and administrators gave her demerits, lowered her grades, and refused to let her take an entrance exam to attend senior high school. She testified that she was permitted to finish the ninth grade, but was refused a diploma for finishing junior high school and was not able to attend senior high school. Huang stayed at home for the next ten months, and during this time she read her Bible and attended church. Government officials later learned of Huang's underground church, and in July 2000 police raided her home. Huang was not home at the time but she testified that several people were arrested and that she thereafter went into hiding. She also testified that her father was later arrested and that her mother relocated several times to evade the authorities.

During the hearing, the immigration judge repeatedly interrupted Huang's direct examination and challenged her about Catholic doctrine and rituals. The judge's questioning was extensive, taking up approximately half the pages in the hearing's transcript. The information about Catholicism upon which the judge relied nowhere appears in the record, and in some instances he refused to allow Huang to explain what he believed were discrepancies or inaccuracies in her answers. Huang's attorney tried repeatedly to object, but the judge told counsel not to interrupt his questioning.

The immigration judge found that Chinese authorities " 'have tightened their grip' over the official Catholic Church

and sought to eliminate the underground Catholic Church which has not been [sic] to government control." But he nevertheless denied Huang's application because he found her not to be credible for several reasons: (1) her answers concerning her knowledge of Roman Catholicism were "disassembling" and contained what he believed was "clearly inaccurate" information; (2) she was unable to identify the whereabouts of the priest of her underground church in China; (3) she was unable to describe the Catholic church that she claimed to attend in Chicago and did not attend church regularly for reasons the judge found ranged "from the transparent to almost the ridiculous"; and (4) she mentioned nothing about religious persecution in her initial interview at the airport. In addition to finding Huang not credible, the immigration judge found that she failed to corroborate her testimony with even "the most common-sensical support" of her Catholic beliefs, such as a letter from her mother or her priest.

## II.  ANALYSIS

Huang challenges the immigration judge's credibility finding, arguing that it is unsupported by the record and does not provide substantial evidence for the decision denying her asylum. Where, as here, the BIA summarily affirms, we review the immigration judge's opinion as if it were that of the BIA. *Ghebremedhin v. Ashcroft*, 385 F.3d 1116, 1119 (7th Cir. 2004). Our review is limited to determining if the immigration judge's decision is supported by substantial evidence. *Georgis v. Ashcroft*, 328 F.3d 962, 967 (7th Cir. 2003). When a decision is based on an adverse credibility finding, we will defer to the immigration judge provided that the credibility finding is supported by "specific, cogent reasons" that "bear a legitimate nexus to the finding." *Capric v. Ashcroft*, 355 F.3d 1075, 1086 (7th Cir. 2004) (internal citation and quotation omitted).

Huang first argues that she was "hardly given an opportunity to present a case" because the immigration judge took over her direct examination, turning it at times into "an outright interrogation." Huang does not argue that the immigration judge's conduct violated her right to due process, *see Kerciku v. INS*, 314 F.3d 913, 917-18 (7th Cir. 2003) (per curiam) (immigration judge "took over the questioning" from applicant's attorney and excluded "complete chunks" of testimony); *Podio v. INS*, 153 F.3d 506, 509-10 (7th Cir. 1998) (judge frequently interrupted testimony and refused to allow a supporting witness to testify), but instead claims that it influenced his credibility finding. In general, an immigration judge may question an asylum applicant provided that his conduct does not demonstrate impatience, hostility, or a predisposition against the applicant's claim. *Hasanaj v. Ashcroft*, 385 F.3d 780, 783-84 (7th Cir. 2004). But here the immigration judge did more than ask Huang a few questions; he actively interjected himself into the proceedings, far exceeded his role of developing the record, and at times assumed an inquisitorial role. *See id.*; 8 C.F.R. §§ 208.9(b), 1208.9(b) (immigration judge shall conduct hearing "in a nonadversarial manner"). More troubling is the judge's repeatedly questioning based on his own assumptions about Catholicism rather than any information contained in the record. We are concerned that the judge's questioning of Huang's religious observance tainted his analysis of her credibility, and with that in mind we turn to Huang's specific arguments regarding the grounds given by the immigration judge for his adverse credibility finding.

Huang argues that the immigration judge's first ground for his credibility finding—Huang's purported lack of knowledge about Catholicism—is improperly based solely on the judge's own personal beliefs about the religion. Indeed, the Catholic doctrine and practices about which the judge assumed Huang should have been familiar are described nowhere in the record. Furthermore, the judge based his

credibility finding partly on mischaracterizations of Huang's testimony and partly on perceived inaccuracies in her testimony that he did not allow her to explain. For example, the immigration judge characterized Huang as testifying that there exists multiple types of baptism in Catholicism, but then dismissed this testimony as "clearly inaccurate" because "there are not." But Huang never testified that there are multiple types of baptism; in response to repeated questions from the immigration judge, she stated only that the word "baptize" can be translated using two different Chinese terms. Later in the hearing, Huang's attorney sought to ask her about the different terms and about the specific ceremonial attributes of each, but the judge cut off this line of questioning, saying "I don't think it's been established exactly whether this difference, which the respondent did refer to, I agree, has any resonates in Catholic doctrine or teaching . . . . Unless you have some information to show that there is such a distinction made, there's no reason to pursue it." His ruling then faulted Huang for thinking that Catholics recognize multiple types of baptism—the very thing he refused to allow her to explain.

The record contains other examples of the immigration judge questioning Huang aggressively about religious practices and then mischaracterizing her testimony. At one point, the immigration judge demanded a specific name for the service held by a Catholic church on Sundays. Huang replied, "We call it mass," but added that her underground church's priest was not always available to hold mass. That led to this exchange:

> IJ: I see. So there wasn't always a priest there, you're saying.
>
> A: No.
>
> IJ: So then sometimes your father celebrated the mass, correct?
>
> A: Yes.

IJ: Okay. Well, do you know that only a priest may celebrate a mass? Do you know that?

A: Yes, I know that.

IJ: Well, then, how could your father do it then?

A: He's not in charge of the mass. He's just leading the congregation for the scripture reading and Bible study—Bible reading.

IJ: Well, ma'am, there could be no mass without the priest. If there was no priest there, there could be no mass, so—so I take it, then even though—so what is your response to that, ma'am? If you say that there was a mass and your father was there and presiding, how could that—that's contrary to Catholic teaching. How could that be?

A: What do you mean, my response to this?

IJ: Well, do you stand by what you said earlier?

A: Yes.

It is unclear from this testimony whether Huang meant that her father led a *mass* or whether he led an alternative ceremony in the absence of the priest, but the immigration judge acted as if he had caught Huang misstating an obvious fact. Furthermore, nothing in the record establishes who may lead a mass or any other type of Catholic service—particularly in an underground Chinese church, which because of its illegal status might have to deviate from formal practices.

There is likewise nothing in the record to substantiate several of the judge's other questions about the Chinese church, which included inquiries about the name of Huang's "parish," the "religious order" of her priest, and the name of the "rectory" where her priest lived. Once again, nothing in the record establishes, as the immigration judge apparently assumed, that Chinese Catholics must be members of

parishes or that priests must belong to orders or live in rectories. The portion of the immigration judge's decision addressing Huang's knowledge of Catholicism is based entirely on either the judge's personal beliefs or some perceived common knowledge about the religion, and is thus not a proper basis for an adverse credibility finding. *See Lin v. Ashcroft*, 385 F.3d 748, 755-56 (7th Cir. 2004) (immigration judge's skepticism "utterly unsupported by any facts in the record" cannot provide basis for adverse credibility finding); *Elzour v. Ashcroft*, 378 F.3d 1143, 1153 (10th Cir. 2004) (immigration judge may not rely on "speculation, conjecture, or unsupported personal opinion" to find applicant's testimony implausible); *Gao v. Ashcroft*, 299 F.3d 266, 278-79 (3d Cir. 2002) (immigration judge's "unsupported assumption" insufficient basis for adverse credibility finding); *Bandari v. INS*, 227 F.3d 1160, 1167 (9th Cir. 2000) ("Personal beliefs cannot be substituted for objective and substantial evidence.").

Huang next argues that the second basis for the immigration judge's credibility finding—that she could not identify the "whereabouts" of her priest in China—is improper. We cannot understand why the immigration judge thought this issue relevant to Huang's asylum claim. The judge said that Huang should have been able to locate the priest "considering the number of years that she claims she was in contact with him." But Huang had not been in China since 2000, and it is unrealistic for the immigration judge to expect her two years later to locate the priest of an illegal underground church whose members have been targeted by Chinese authorities. Nor do we understand how Huang's inability to contact her former priest would bear on her credibility.

Huang next argues that the immigration judge should not have relied on her irregular church attendance in Chicago in finding her not credible. Huang testified that she lives in a Hispanic neighborhood and does not attend the church nearest her home because services there are conducted only

in Spanish. The church she attends is further away, but she does not go all the time because of transportation difficulties and because she cannot fully understand the services, which are conducted in English. The immigration judge deemed Huang's sporadic church attendance inconsistent with her professed "fervent catholicism" and dismissed her explanations as ranging "from the transparent to almost the ridiculous." We do not understand why the immigration judge would find it "ridiculous" that Huang might not regularly attend an English-language church service that she could not fully comprehend, especially at a church located some distance from her home. Furthermore, the basis for Huang's asylum claim is not that she is a "fervent" Catholic—she never said she was—but rather that she belonged to an illegal church. Nothing in her testimony or the record suggests that Chinese officials target only "fervent" members of illegal churches.

Next, Huang contends that the immigration judge should not have based his adverse credibility finding on her failure to mention her fears of religious persecution when she was interviewed by immigration officials at the airport. It is true that an adverse credibility finding can be supported by new factual assertions made in an application for asylum that were not made originally to officials upon arrival in the United States. *See Balogun v. Ashcroft*, 374 F.3d 492, 501 (7th Cir. 2004); *Oforji v. Ashcroft*, 354 F.3d 609, 614 (7th Cir. 2003). But the immigration officer at the airport never asked Huang whether she was afraid of returning to China or wished to seek asylum. We have previously cautioned that airport interviews are less reliable when, as here, the questions asked are not designed to elicit the details of an asylum claim. *See Balogun*, 374 F.3d at 505. Moreover, our misgivings about other parts of the immigration judge's decision lead us to conclude that Huang's failure to mention her fear of religious persecution at the airport is not sufficient to discredit her. *Cf. Georgis*, 328 F.3d at 970 (vacating

order of removal when five of the six reasons for adverse credibility finding were improper or unsupported).

The immigration judge here exceeded his proper role in questioning Huang and his conduct during the hearing tainted his credibility finding. We conclude that the judge's adverse credibility finding here was improper because it relies far too much on his own personal experience and beliefs, and is thus unsupported by "specific, cogent reasons" that "bear a legitimate nexus to the finding." *Capric*, 355 F.3d at 1086 (internal citation and quotation omitted).

Although we have determined that the immigration judge's credibility finding is an inappropriate basis for denying Huang's application for asylum, we must also address the judge's alternative ground that Huang failed to corroborate her testimony. *See Lin*, 385 F.3d at 751. Huang argues that the immigration judge's demands for documentation of her claims—he said she should have presented letters from her mother and "her priest" attesting to her church membership—were unreasonable and difficult for her to obtain. When an immigration judge denies an asylum application for lack of corroborating evidence, the judge must: (1) make an explicit credibility finding; (2) explain why additional corroboration is reasonable; and (3) explain why the alien's explanation for not producing the requested corroboration is inadequate. *Gontcharova v. Ashcroft*, 384 F.3d 873, 877 (7th Cir. 2004).

The corroboration the immigration judge requested here was unreasonable because it was irrelevant to the key aspects of Huang's asylum claim and would have addressed only the judge's unsupported concerns that Huang was not truly a Catholic. We doubt that the judge would have considered a letter from Huang's mother to be particularly strong evidence. *Cf. Lin*, 385 F.3d at 757 ("Although the government suggested at oral argument that affidavits from her family members could have supported Lin's case, we are

hard pressed to believe that these affidavits would have convinced the IJ that Lin's testimony was credible."); *Kourski v. Ashcroft*, 355 F.3d 1038, 1039 (7th Cir. 2004) ("it is odd to think a brother's affidavit would be persuasive evidence"). As for the letter from "her priest," it is unclear whether the immigration judge meant Huang's priest in Chicago or her priest in China. A letter from her priest in Chicago might have helped establish that Huang is now a practicing Catholic, but that priest could not possibly corroborate any of the key events in China that provided the basis for her asylum claim. If the judge wanted a letter from her priest in China, this was not a reasonable request because Huang testified that she was unable to contact that priest, and the immigration judge never explained why her explanation was inadequate. We thus conclude that the lack of corroboration was likewise an improper basis for denying Huang's application for asylum. Lastly, we note that Huang also originally applied for withholding of removal and relief under the Convention Against Torture. But neither her brief to the BIA nor her opening brief in this court addresses these claims, so they are waived. *See Capric*, 355 F.3d at 1087.

## III.  CONCLUSION

The decision denying Huang's asylum is not supported by substantial evidence. *See Georgis*, 328 F.3d at 967. Accordingly, her petition for review is GRANTED, the order of removal is VACATED, and this case is REMANDED for further proceedings. Because of our concerns about the judge's conduct during Huang's removal hearing, we encourage the BIA to assign this case to a new immigration judge. *See, e.g.*, *Muhur v. Ashcroft*, 355 F.3d 958, 961 (7th Cir. 2004).

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*