In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-1614

PEDRO FLORES TORRES,

*Petitioner,*

*v.*

MICHAEL B. MUKASEY, ATTORNEY GENERAL
OF THE UNITED STATES,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A98-520-315

ARGUED SEPTEMBER 8, 2008—DECIDED DECEMBER 23, 2008

Before POSNER, KANNE, and TINDER, *Circuit Judges.*

KANNE, *Circuit Judge.* Pedro Flores Torres, a native and
citizen of Honduras, seeks asylum, withholding of re-
moval, and relief under the Convention Against Torture.
Torres claims that he was persecuted while a soldier in the
Honduran army because of his membership in a social
group—namely, his family, which included four older
brothers, three of whom were military deserters. Torres

asserts that he was tortured and abused as punishment for his brothers' actions. On May 31, 2006, Immigration Judge Carlos Cuevas declined Torres's primary requests for asylum, withholding of removal, and protection under the Convention Against Torture, granting instead his alternative prayer for voluntary departure. The IJ found that Torres lacked credibility because of, first, inconsistencies and omissions in Torres's written application for asylum and his testimony at a series of immigration hearings, and second, Torres's inability to establish the requisite nexus between Torres's mistreatment and his family's unfavorable reputation in the Honduran military. The Board of Immigration Appeals summarily affirmed the IJ's decision in an order issued February 15, 2008. We find that the IJ's credibility determination was tainted due to the IJ's improper conduct during the hearings and that there was not substantial evidence to support the IJ's conclusions. We vacate the decisions of the BIA and IJ and remand for further proceedings.

## I. HISTORY

Pedro Flores Torres entered the United States without inspection in October 2003 and submitted a written application for asylum and withholding of removal one year later. In December 2004, the Department of Homeland Security charged Torres with being removable as an unadmitted alien pursuant to 8 U.S.C. § 1182(a)(6)(A)(i). At a series of immigration hearings held in April and May 2006, Torres admitted he was removable but renewed his

requests for asylum and withholding of removal, as well as relief under the Convention Against Torture. Torres's written application, accompanying affidavits, and testimony by Torres and his brother Juan Carlos provide the following facts.

*A. The Flores Torres Family*

From 1959 to 1979, Guadalupe Torres gave birth to eight children in Comayagua, a village in Honduras. Five of these children were boys. The oldest son, Mario Noe, was born in 1959. The next three sons—Luis Elias, Gerardo Isaac, and Juan Carlos—were born in 1962, 1969, and 1977, respectively. The youngest child, Pedro Alfredo, is the petitioner in this matter and was born in 1979. The children's father left the family shortly after Pedro's birth.

Pedro's four older brothers were conscripted into the Honduran navy, where each spent at least some time at the naval base in Amapala, near the El Salvadoran border. While serving, each of the four older sons endured brutal mistreatment at the hands of his superiors. Three of the four ultimately deserted the navy to escape these abuses. Because Pedro's claims are based largely on his brothers' experiences within the Honduran military, those experiences merit some discussion.

Mario is the only Torres son not considered a military deserter. Mario served for approximately one year, during which time his arm was broken and his ear punctured, resulting in permanent hearing damage. He escaped, only to be captured and put back into active service. At one

point, Mario, Luis, and Gerardo were all serving in the Honduran military at the same time. This prompted the navy, due in part to heavy lobbying by Gerardo, to release Mario pursuant to a Honduran law that prohibited any one family from having more than two members in the military.

The second son, Luis, suffered two broken arms from a severe beating with a baton and fled the navy soon thereafter. Soldiers found him in a hospital and returned him to duty. After enduring further mistreatment, Luis escaped again, this time with a broken leg. When the military found Luis the second time, it determined that his disabled condition rendered him useless to serve and designated him a deserter.

The actions of the third son, Gerardo, were particularly aggravating to the military. In addition to lobbying for Mario's discharge, Gerardo refused to commit war crimes, citing his Christian faith to explain his unwillingness to kill his innocent countrymen. Gerardo was imprisoned for fifteen days, deprived of food, and savagely beaten. As further punishment, his commander made Gerardo walk through a field of land mines while the commander lobbed grenades in his direction, one of which tore away one of Gerardo's legs and ravaged his back with shrapnel. His commander left Gerardo to die in the mine field, but Gerardo's compatriots helped him escape alive. Faced with what he felt was a certain death if he returned to his unit, Gerardo deserted.

Juan Carlos, only two years Pedro's senior, was conscripted into the Honduran navy in 1994 at the age of

seventeen, one year before he was of legal age to serve. He was singled out for abuse because of Gerardo's exploits. Once, when Juan Carlos fell during a run, a superior officer slashed his leg with a bayonet, inflicting an injury that required surgery. Following the operation, doctors told Juan Carlos that he needed two months to recover; instead, he was forced back into training after only fifteen days. His unhealed leg made it impossible for him to perform, and the premature exercise reopened his wound. Juan Carlos deserted in 1995.

Today, two of the brothers, Mario and Luis, live secretly in Honduras, afraid of military retribution for their family's history. Gerardo and Juan Carlos both escaped to the United States. Gerardo was granted asylum in 1994 and died one year later, at the age of twenty-five, from brain cancer. Juan Carlos was granted asylum in 1995 and is now a United States citizen. He resides in Elkhart, Indiana, near two of his sisters, both of whom are legal permanent residents.

As a result of these disturbing circumstances, repeated not once but four times, the tale of the Flores Torres brothers has apparently gained some notoriety within Honduran military circles: the Flores Torres clan is known as a family of deserters. Juan Carlos was the first son punished by the military in retribution for his brothers' exploits. His past persecution on account of his family formed the basis of his successful asylum claim. As we will discuss below, Pedro, the youngest son and the last to serve in the military, also was forced to pay for the perceived offenses of his four brothers.

*B. Pedro Flores Torres's Tenure in the Honduran Army*

Born September 26, 1979, Pedro Alfredo Flores Torres attended school in Comayagua until age eleven. For the next eleven years, he painted automobiles for car repair shops, earning money to help support his mother.

Pedro stated in both his written asylum application and his testimony before the immigration judge that in February 2002, two Honduran soldiers left notice at Guadalupe's home that Pedro had twenty-four hours to report for military duty. Although military service is no longer compulsory in Honduras, Pedro testified that he felt he "did not have any other option" but to enlist. If he did not, Pedro believed that he would be found and beaten, or worse, would simply "disappear." The next day, Pedro reported to the Primer Battalon de Artilleria, an inland army base near the town of Zambrano, where he became a member of the artillery corps.

According to Pedro's testimony, upon reporting for duty he was confronted by his commanding officer, Colonel Luis Martinez. Pedro testified that Martinez said to him, "I was waiting. . . . You are the last one in the family."

Pedro claimed that he was subjected almost immediately to physical and mental abuse from his superiors—mistreatment above and beyond anything suffered by other soldiers. Pedro stated that officers and other soldiers called him degrading names and violently beat him. According to his affidavit, Pedro's fellow soldiers and a superior officer told Pedro that his mistreatment was "because of [his] brothers."

Pedro mounted two unsuccessful escape attempts during his first six months of service. The first, which came approximately five months into Pedro's tenure, ended with a savage beating at the hands of military guards who apprehended Pedro in the act of fleeing. The second came only a week later and again ended with a beating from a guard's baton. Following the second attempt, Pedro was stripped of his clothing and locked in solitary confinement, a place Pedro called "the hole."

In his affidavit, Pedro said the hole was "what hell must be like." A darkened room measuring one meter on all sides, the hole provided no space for its captive to lie down. There was little ventilation, and the heat was intense. Because he could not leave, Pedro was forced to use the hole to relieve himself. For forty days, Pedro remained trapped, nude, in his own excrement; the stench was overwhelming. During those forty days, Pedro was given beans and tortillas once a day, as well as two small servings of water. When he finally emerged, Pedro had lost forty pounds, one-third of his body weight.

Pedro discussed the name calling, the beatings, the two failed escape attempts, and the forty days of solitary confinement in both his written asylum application and his testimony. During his testimony before the immigration judge, however, Pedro discussed several additional examples of abuse for the first time.

In the first, Colonel Martinez ordered Pedro stripped nude and placed in a large, water-filled barrel. The water was high enough that only Pedro's nose remained above the surface. Pedro stated that his first time in the water

barrel occurred one month after he enlisted; the last was in July 2003, one month before he successfully escaped. On questioning by the immigration judge, Pedro testified that he was subjected to the water barrel on approximately eighty different occasions, and that he was sometimes held in the barrel for as long as ten hours; other times he was held overnight. He further testified that fifteen times medics had to pump his chest when he was pulled from the water barrel. Martinez told Pedro that the water barrel was "to pay for the escape of [his] brothers."

The second relevant chain of events that emerged during Pedro's testimony involved mock killings at the hands of Colonel Martinez. Pedro stated that Martinez would tell him, "I'm going to kill you," place a pistol to Pedro's head, and pull the trigger. The gun, unbeknownst to Pedro, was unloaded. Pedro testified that Martinez said this was to make Pedro "pay for [his] brothers' desertion." The first of "many times" these mock executions occurred was two to three weeks after Pedro joined the army.

The final example of mistreatment that Pedro discussed for the first time during his immigration hearings was Colonel Martinez forcing him to run nude in front of his unit. According to Pedro, one month into his time with the army, Martinez forced Pedro to run completely naked during a training run, with nothing covering him but a rifle slung across his back and a second rifle that he carried in his arms. He was even denied footwear. Pedro testified that Martinez ordered his soldiers to "[p]ut this man to run until he falls dead." Pedro also stated, in testimony that was often jumbled because of

language difficulties and the IJ's frequent interruptions, that Martinez told him, "[Y]ou have to pay for what your brothers did for their escape because they violated. They defy the army." Pedro stated that this occurred on numerous occasions.

Seventeen months after he joined the Honduran army, Pedro succeeded in escaping during a military celebration. After a brief visit with his mother, whom the military had prevented Pedro from seeing during his time in the army, Pedro began his journey north to seek refuge with his family in the United States. He now lives near his brother and two sisters in Elkhart.

C. *Prior Decisions by the Immigration Judge and the Board of Immigration Appeals*

Immigration Judge Cuevas held a series of three hearings on April 19, April 25, and May 31, 2006. The IJ played an active role in the hearings, frequently interjecting himself into the testimony. At the conclusion of the proceedings, the IJ issued an oral decision denying Pedro's requests for asylum, withholding of removal, and protection under the Convention Against Torture. The IJ based his decision on what he found to be Pedro's lack of credibility. The IJ granted Pedro's alternative request for voluntary departure. The BIA summarily affirmed the IJ's decision in a written opinion issued on February 15, 2008.

## II. ANALYSIS

An IJ's decision to deny a petition for asylum and withholding of removal is a finding of fact that we review for substantial evidence. *Capric v. Ashcroft*, 355 F.3d 1075, 1086 (7th Cir. 2004). We must affirm the immigration court's decision if it is supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (internal quotation marks omitted). We will reverse only if the evidence " 'compels [a] contrary conclusion.' " *Ciorba v. Ashcroft*, 323 F.3d 539, 544 (7th Cir. 2003) (quoting *Bradvica v. INS*, 128 F.3d 1009, 1012 (7th Cir. 1997)). When, as here, the BIA adopts the reasoning of the IJ, we review the IJ's decision under this deferential standard. *Ursachi v. INS*, 296 F.3d 592, 594 (7th Cir. 2002).

In this case, Torres pursued three alternative paths to avoid removal from the United States: asylum, withholding of removal, and protection under the Convention Against Torture. Below, we first discuss the standards for these claims. The IJ's decision in all three of these areas hinged on his determination that Pedro's evidence lacked credibility, a finding that we review in depth in the final portion of our discussion.

### A. Standards for Asylum, Withholding of Removal, and Relief Under the Convention Against Torture

The IJ first rejected Torres's petition for asylum. A petitioner for asylum bears the burden of proving that he is a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42). *See also* 8 C.F.R. § 1208.13(a). Specifically, Torres must

demonstrate that, because of his race, religion, nationality, membership in a particular social group, or political opinion, he either was the victim of past persecution or maintains a well-founded fear of future persecution. *Oryakhil v. Mukasey*, 528 F.3d 993, 998 (7th Cir. 2008); *see also* 8 U.S.C. § 1101(a)(42); 8 C.F.R. § 1208.13(b). Even if an individual satisfies these requirements, he is not guaranteed asylum. Final asylum decisions rest in the discretion of the Attorney General or the Secretary of Homeland Security. *Jun Ying Wang v. Gonzales*, 445 F.3d 993, 997 (7th Cir. 2006); *see also* 8 U.S.C. § 1158(b)(1)(A).

The IJ also declined Torres's second request, which was for withholding of removal pursuant to 8 U.S.C. § 1231(b)(3). To succeed in this claim, Torres must establish a clear probability of persecution if returned to Honduras. *See Prela v. Ashcroft*, 394 F.3d 515, 519 (7th Cir. 2005). In other words, Torres must show that it is more likely than not that he would be persecuted upon return to his native country. *See id.* As with claims for asylum, the persecution here must be on account of one of the five statutorily defined grounds. *Id.*; *see also* 8 U.S.C. § 1231(b)(3). The "clear probability of persecution" standard is a higher threshold than that for asylum. *Bevc v. INS*, 47 F.3d 907, 910 (7th Cir. 1995). Thus, because Torre's attempt at asylum failed, his claim for withholding of removal had to fail as well. *See Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir. 2002).

Successful applicants for either asylum or withholding of removal must show that they have been, or will be, the victim of persecution. We have described "persecution" as

"punishment or the infliction of harm for political, reli-
gious, or other reasons that this country does not
recognize as legitimate." *De Souza v. INS*, 999 F.2d 1156,
1158 (7th Cir. 1993). Acts of persecution must rise above
"mere harassment," *Roman v. INS*, 233 F.3d 1027, 1034 (7th
Cir. 2000), and include threats to life or freedom, as well
as non-life threatening violence or physical abuse, *Ciorba*,
323 F.3d at 545. As examples of persecution, we have
cited "detention, arrest, interrogation, prosecution, im-
prisonment, illegal searches, confiscation of property,
surveillance, beatings, or torture." *Mitev v. INS*, 67 F.3d
1325, 1330 (7th Cir. 1995).

As a third and final avenue to avoiding removal, Torres
also requested protection under the Convention Against
Torture. *See* 8 C.F.R. § 208.16(C). To succeed, Torres
must prove that it is more likely than not that he will be
tortured within the meaning of the Convention if he
returns to Honduras. *See Prela*, 394 F.3d at 519; *see also*
8 C.F.R. § 208.16(c)(4). "Torture" is "any act by which
severe pain or suffering, whether physical or mental, is
intentionally inflicted on a person . . . by or at the instiga-
tion of or with the consent or acquiescence of a public
official or other person acting in an official capacity."
8 C.F.R. § 208.18(a)(1). The IJ in this case declined Torres's
request for relief under the Convention Against Torture.

B.    *The IJ's Adverse Credibility Determination*

The IJ rejected all three of Torres's claims—for asylum,
withholding of removal, and protection under the Con-

vention Against Torture—solely because the IJ found that Torres's evidence lacked credibility.

One of an immigration judge's primary functions is to assess the credibility of an applicant's evidence. *Capric*, 355 F.3d at 1085. When making a credibility determination, an IJ evaluates the applicant's claims "only for internal consistency, detail, and plausibility." *Id.* The IJ's credibility finding is often paramount "[b]ecause direct authentication or verification of an alien's testimony and/or evidence is typically very difficult and often impossible." *Id.* In lieu of direct evidence, an alien's credible testimony, by itself, is generally sufficient to sustain the alien's burden of proof. *Lin v. Ashcroft*, 385 F.3d 748, 756 (7th Cir. 2004); *Uwase v. Ashcroft*, 349 F.3d 1039, 1041 (7th Cir. 2003); *see also* 8 C.F.R. § 208.13(a). If the IJ finds an alien's testimony to be incredible, however, then the alien must provide either a convincing explanation for the noted discrepancies in his evidence or credible evidence that corroborates his claims. *Capric*, 355 F.3d at 1086.

If the IJ's credibility determination is supported by "specific, cogent reasons that bear a legitimate nexus to the finding," then this court will be highly deferential in its review of that conclusion. *Capric*, 355 F.3d at 1086 (internal quotation marks omitted); *see also Hysi v. Gonzales*, 411 F.3d 847, 852 (7th Cir. 2005) ("We give great deference to an IJ's credibility determinations *so long as* they are supported by cogent reasons that bear a legitimate nexus to the finding." (emphasis added)); *Ahmad v. INS*, 163 F.3d 457, 461 (7th Cir. 1999). We will not, however, "defer to credibility determinations drawn from insuffi-

cient or incomplete evidence, nor shall we uphold adverse credibility determinations based on speculation or conjecture, rather than on evidence in the record." *Korniejew v. Ashcroft*, 371 F.3d 377, 383 (7th Cir. 2004) (international quotation marks and citations omitted)).

In addition, we have recognized that an IJ's improper behavior while conducting an immigration hearing can render his credibility determinations unreliable. *See, e.g.*, *Huang v. Gonzales*, 403 F.3d 945, 950-51 (7th Cir. 2005). The record reveals that the IJ's conduct had that effect here. Thus, before beginning our substantive review of the specific reasons the IJ gave in support of his adverse credibility determination, we find it necessary to discuss our disapproval of the IJ's conduct during Torres's hearings.

### 1.  *The Immigration Judge's Conduct During the Hearings*

For purposes of developing the record, an immigration judge may question an applicant for asylum during a hearing. *Hasanaj v. Ashcroft*, 385 F.3d 780, 783 (7th Cir. 2004). In so doing, the IJ may not "demonstrate impatience, hostility, or a predisposition against the applicant's claim." *Huang*, 403 F.3d at 948. We have overturned an IJ's credibility findings when the IJ does more than "ask . . . a few questions," but instead "actively interject[s] himself into the proceedings, far exceed[s] his role of developing the record, and at times assume[s] an inquisitorial role." *Id.* That is exactly what the IJ did here.

The transcripts of Torres's immigration hearings are littered with lengthy discourses by the IJ. In fact, it appears

from the transcripts that direct questioning by the IJ occupied more than half of the hearings. The IJ's impatience with Torres was glaring, even through the emotionless pages of the hearing transcript. The IJ grew frustrated with the language barrier, a problem the IJ exacerbated by his unwillingness to give Torres the time he needed to compose his thoughts into meaningful sentences. Instead, the IJ assumed the role of inquisitor, incessantly interrupting Torres while he tried to assimilate his responses. The IJ's questioning was so pervasive that it was often difficult to determine who was representing the federal government with more fervor—the IJ or the government's attorney.

At times the IJ's comments crossed the line. During one particularly troubling exchange concerning the occasions on which Martinez forced Torres to run nude in front of his unit, the IJ, noting the heat in Honduras, said, "I guess my point is that if it was hot outside, you'd rather run with less clothes, not naked. But you'd rather run with less clothes because it's more comfortable." (R. at 224.) The IJ seemed to be implying that Colonel Martinez, by forcing Torres to run nude in extreme heat, was actually doing him a favor.

At other times during the hearings, the IJ drew wholly unsubstantiated comparisons between service in the Honduran and American militaries. In the course of his questioning, the IJ referred to "boot camp" and "drill sergeants," common American military concepts that were clearly unfamiliar to Torres. At one point, the IJ referenced a "signal man" in a question to Torres. When

Torres's counsel asked the IJ to clarify the term, the IJ replied simply, "He would know."

We find the IJ's conduct in this case analogous to the IJ's conduct in *Huang*, 403 F.3d 945. There, the petitioner, a Chinese citizen, sought asylum based on her fear of persecution for her membership in an illegal Catholic church. *Id.* at 946. During the petitioner's immigration hearing, the IJ aggressively questioned her, interrupted her, mischaracterized her testimony, and relied upon his personal knowledge of the Catholic faith in reaching his decision. *Id.* at 946, 947, 949-51. We concluded that the IJ's excessive role in the questioning of the petitioner, his improper conduct during the hearing, and his reliance on personal beliefs rather than information contained in the record served to "taint" the IJ's credibility finding. *Id.* at 950-51. As such, we found the tainted credibility finding "unsupported by specific, cogent reasons that bear a legitimate nexus to the finding" and remanded the case for further proceedings. *Id.* at 951 (internal quotation marks omitted).

Although we do not believe, as Torres argues, that the IJ's conduct was so egregious as to violate Torres's due process rights, we do find that the IJ's overactive role during the hearings, his demonstrated impatience, his improper lines of questioning, and his reliance on personal knowledge beyond the facts in the record tainted his credibility findings. This conclusion, by itself, is sufficient to remand the case. *See id.* Because the IJ made additional errors in his analysis, however, we turn briefly to his substantive findings.

The IJ based his adverse credibility determination on three basic grounds: first, alleged inconsistencies surrounding the circumstances attending Torres's enlistment in the Honduran army; second, Torres's purported inability "to provide the nexus for the mistreatment"; and third, a series of three events that Torres omitted from his written asylum application and discussed for the first time during his testimony before the IJ. We consider each of these grounds in turn.

2. *The Circumstances Attending Torres's Enlistment in the Honduran Army*

In his opinion, the IJ focused at length on the circumstances surrounding Torres's decision to join the Honduran army. The IJ found particularly concerning (1) Torres's alleged confusion about whether military service in Honduras was voluntary or compulsory, (2) apparent inconsistencies in Torres's testimony regarding his level of pre-enlistment knowledge of the mistreatment endured by his brothers during their military service, and (3) Torres's inability to explain why the military, if it was so intent on punishing the Flores Torres family, waited until Torres was twenty-two years old—four years older than the legal age of service—before forcing his enlistment. For the following reasons, we conclude, first, that Torres's motivations for enlisting in the Honduran army are irrelevant to his claims of past persecution; and second, that the IJ erred in looking for evidence of Torres's subjective fear of past persecution.

First, we find that Torres's motivations behind his decision to join the Honduran army are irrelevant to his asylum application, and, as such, cannot form the basis for an adverse credibility determination. We have frequently overturned an IJ's credibility determination if it is based on immaterial or inconsequential facts. *See, e.g.*, *Dong v. Gonzales*, 421 F.3d 573, 577 (7th Cir. 2005); *Georgis v. Ashcroft*, 328 F.3d 962, 968 (7th Cir. 2003); *Uwase*, 349 F.3d at 1043; *see also Korniejew*, 371 F.3d at 383-84 (recognizing that a "minor inconsistency" alone was not enough to support an adverse credibility determination before finding additional facts to support upholding the IJ's finding). What matters to Torres's claim is whether he was persecuted on account of his familial ties once he became a soldier, not why he joined the Honduran army in the first place. The IJ's reliance on these facts was misplaced. There is no logical connection between Torres's reasons for enlisting and his claims of mistreatment while he served. Given the controlling questions of this case, such facts do not constitute "a valid, cogent reason for a negative credibility finding." *Uwase*, 349 F.3d at 1042; *see also Korniejew*, 371 F.3d at 387 ("[W]e remind those evaluating administrative records that adverse credibility determinations should not be grounded in trivial details or easily explained discrepancies; as recounted above, an adverse credibility determination must be supported by 'specific, cogent reasons' that 'bear a legitimate nexus to the finding.'" (quoting *Ahmad*, 163 F.3d at 461)).

Second, to the extent that the IJ considered whether the circumstances surrounding Torres's enlistment in the

Honduran military provided a basis for his subjective fear of persecution in the *past*, that analysis was in error. To establish a successful claim for asylum, an applicant must show *either* that he was the victim of past persecution *or* that he has a well-founded fear of future persecution. *Oryakhil*, 528 F.3d at 998; *see also* 8 U.S.C. § 1101(a)(42); 8 C.F.R. § 1208.13(b). A fear of *future* persecution must be both objectively and subjectively reasonable to be "well-founded." *Kllokoqi v. Gonzales*, 439 F.3d 336, 345 (7th Cir. 2005); *see also* 8 C.F.R. § 1208.13(b)(2). A victim of *past* persecution need not show any objective or subjective fear—only that he was in fact persecuted. *See Bolante v. Mukasey*, 539 F.3d 790, 794 (7th Cir. 2008) ("Unless a petitioner establishes past persecution[,] . . . a petitioner must show that the fear of future persecution is subjectively genuine and objectively reasonable."). In this case, Torres seeks to prove that the Honduran military persecuted him in the past; nonetheless, the IJ attempted to determine whether Torres "subjectively feared any persecution by surrendering himself to the military." (R. at 78.) If, as the IJ's opinion seems to indicate, the IJ was looking to these facts to establish Torres's subjective fear of persecution in the *past*, that analysis was incorrect.

3.  *The Nexus for Torres's Mistreatment as a Precondition to Credibility*

As another basis for his adverse credibility determination, the IJ stated that "[t]he difficulty with crediting the respondent's testimony is his inability to provide the nexus for the mistreatment." (R. at 79.) As we discuss

below, this analysis erected an insurmountable burden in Torres's quest for asylum and, as such, was in error.

An applicant for asylum must demonstrate a nexus between his alleged persecution and one of five protected grounds. *Wang*, 445 F.3d at 998; *Tamas-Mercea v. Reno*, 222 F.3d 417, 425-26 (7th Cir. 2000). A successful asylee must show that he was persecuted because of his race, religion, nationality, membership in a particular social group, or political opinion. *Tamas-Mercea*, 222 F.3d at 425. Our prior opinions make it clear that we consider family to be a cognizable social group within the meaning of the immigration law. *Iliev v. INS*, 127 F.3d 638, 642 & n.4 (7th Cir. 1997) (discussing this court's history on this issue). Our sister circuits share this view. *See, e.g.*, *Lopez-Soto v. Ashcroft*, 383 F.3d 228, 235 (4th Cir. 2004); *Jie Lin v. Ashcroft*, 377 F.3d 1014, 1028 (9th Cir. 2004); *Gebremichael v. INS*, 10 F.3d 28, 36 (1st Cir. 1993); *see also In re Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985) (holding that a social group consists of persons sharing "a common, immutable characteristic . . . such as sex, color, or kinship ties . . ."), *overruled on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439, 439 (BIA 1987).

Although an individual seeking asylum must prove the requisite nexus to his claims of past or future persecution before his claim for asylum will be successful, he need not—in fact, he generally cannot—prove this nexus as a precondition to credibility. One must be careful not to confuse the ultimate question—whether the petitioner qualifies as a "refugee"—with the credibility analysis, which looks only at consistency, detail, and

plausibility. *Capric*, 355 F.3d at 1085 ("A credibility analysis should not be confused with a burden of proof analysis . . . .").

In stating that "[t]he difficulty with crediting the respondent's testimony is his inability to provide the nexus for the mistreatment," the IJ conflated the nexus and credibility questions.[1] This placed Torres in a no-win situation. Torres attempted to prove the nexus for his mistreatment through his testimony, which the IJ found incredible; yet before the IJ would credit Torres's testimony, he required a nexus for Torres's mistreatment. Requiring a nexus for the mistreatment as a precursor for credibility was legal error.

Even assuming, *arguendo*, that the IJ did not err by requiring a nexus for Torres's mistreatment as a prerequisite to finding him credible, a proper analysis of the record shows that Torres clearly did establish such a nexus. The IJ's conclusions to the contrary—which we reiterate are tainted by the IJ's improper conduct—are without support in the record, are irrelevant, or are based on the

---

[1] The government argues that the IJ's nexus finding was independent of its adverse credibility determination. It contends that the IJ found, first, that Torres's evidence was incredible, and second, that Torres had not established the requisite nexus for a successful asylum claim. Careful reading of the IJ's opinion makes it clear that this was not the case. According to the opinion, Torres's inability to provide the nexus for his mistreatment was yet another reason the IJ concluded that Torres lacked credibility.

IJ's speculation and, as such, do not provide a proper basis for an adverse credibility determination. *See Georgis*, 328 F.3d at 968; *Korniejew*, 371 F.3d at 383.

Torres's testimony is rife with examples that provide his family's history as the nexus for his mistreatment. Throughout the hearing, Torres noted the numerous occasions on which Colonel Martinez, his primary persecutor, referenced Torres's family while inflicting harm on Torres. In at least one instance when Martinez placed an unloaded pistol to Torres's head and pulled the trigger, Torres testified that Martinez said, "You are going to pay for your brothers' desertion. You are going to pay for his escape because you are the last one that you we [sic] have." (R. at 132.) According to Torres's testimony, Martinez told Torres that he placed Torres in the water barrel because "I had to pay for the escape of my brothers." (R. at 200.) Torres testified that when Martinez forced Torres to run nude in front of his unit, Martinez ordered, "Put this man to run until he falls dead. . . . Because you have to pay for what your brothers did for their escape because they violated. They defy the army." (R. at 199.) Torres also stated, "I was so afraid that I was going to stay in [the army] and I was afraid to die in there. Because . . . Colonel Luis Martinez told me that I was never going to leave that place. . . . Because I was going to pay for my brothers' escape because I was the last one that remained." (R. at 136-37.)

The IJ disregarded these statements and numerous others like them scattered throughout Torres's testimony. Instead, the IJ focused on purported inconsistencies

regarding Martinez's involvement in, and motivation for, the mistreatment of Torres. In particular, the IJ questioned (1) why Martinez, if he played such a pivotal role in Torres's mistreatment, was not named in Torres's written asylum application; (2) why Martinez would say he knew Torres's mother, while Guadalupe had no recollection of Martinez; (3) the plausibility of Torres's story about his family's military reputation in light of the different branches of military involved, the distance between the implicated military bases, and the length of time between the service of Torres's brothers and his own; and (4) whether Torres's mistreatment was punishment for his poor performance and his improper acts, not for his family's affronts to the Honduran military. None of these provides a sound basis for the IJ's adverse credibility finding.

This court has stated that "we will not automatically yield to the IJ's conclusions when they are drawn from insufficient or incomplete evidence." *Georgis*, 328 F.3d at 968. Similarly, we will not uphold credibility determinations "'based on speculation or conjecture, rather than on evidence in the record.'" *Korniejew*, 371 F.3d at 383 (quoting *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002)).

Keeping these things in mind, we turn first to Martinez's purported absence from Torres's affidavit. Other circuits have recognized that the "failure to file an application form that was as complete as might be desired cannot, without more, properly serve as the basis for a finding of a lack of credibility." *Aguilera-Cota v. INS*, 914 F.2d 1375, 1382 (9th Cir. 1990). A reading of the

affidavit in this case reveals that although it does not mention Martinez by name, it does reference the role of Torres's "supervisors" and "officers" in his mistreatment. In the affidavit, Torres noted that he was singled out for mistreatment by his "supervisors." (R. at 396.) He also stated that "an officer who was training me told me directly that I received mistreatment because my last name was Flores Torres." (R. at 396-97.) We find this to be more than ample specificity for the affidavit and in no way contradictory with Torres's subsequent testimony. There is no basis here for an adverse credibility determination.

Next, we find it irrelevant to Torres's claim whether Martinez knew Guadalupe Torres. Again, what matters is whether Martinez knew of Torres's brothers and their history in the Honduran military. Martinez's relationship, or lack thereof, with Guadalupe has little or no bearing on this. Further, we find the two statements—that Martinez knew Guadalupe but that Guadalupe had no memory of Martinez—not inconsistent. It is not clear from the testimony whether Martinez merely knew *of* Guadalupe (perhaps because of her status as the mother of the Flores Torres boys), or whether he claimed to know her personally. In addition, it is perfectly plausible that one party to an encounter has memory of the meeting while the other does not.

Third, the IJ speculated that Martinez did not know the history of the Flores Torres family. Without this information, Martinez would have no reason to persecute Torres on account of his membership in that family. In reaching

this conclusion, the IJ found persuasive that Torres served in a different branch of the military (the Honduran army) than did his four brothers (all of whom served in the Honduran navy). He also noted the long distance between the naval base located in Amapala, where Torres's brothers served, and the army base near Zambrano, which is where Torres was stationed. Finally, the IJ discussed the length of time between when Mario, Torres's oldest brother, served, and when Torres served. The problem, however, is that the conclusion that Martinez was unaware of the Flores Torres family's reputation within Honduran military circles is wholly without support in the record. The only evidence is unequivocal on this point. It shows that Martinez was well-versed in the exploits of the Flores Torres boys. The IJ's attempts to cobble together a different story are based on nothing but speculation and conjecture.

Finally, Torres does not dispute, and the IJ correctly noted, that the punishment Torres received following both of his unsuccessful escape attempts came at the hands of unknowing soldiers and, hence, was not persecution on account of his family. What the IJ ignores, however, is the many other incidents—the water barrel, the mock executions, the running in the nude—that were done separate and apart from Torres's escape attempts. As discussed above, it is these events, based on Martinez's own words, that form the nexus for Torres's persecution.

The IJ attempts to wrap these abuses in a blanket justification: punishment for Torres's inability "to perform his exercises and responsibilities as a recruit to the satis-

faction of his superiors." (R. at 80.) Again, however, there is no information in the record to support this conclusion. The IJ improperly relied on his own assumptions about the Honduran military and Torres's performance as a soldier to reach his decision.

### 4. Omissions from Torres's Supporting Affidavit

By far the most troubling aspect of Torres's application for asylum is that he omitted three separate series of significant events from his written application for asylum. Torres described these events in detail during his hearings before the IJ, but he failed to mention them at all in his written application. The first are the incidents in which Martinez submerged Torres up to his chin in a barrel of water for up to ten hours at a time. On examination by the IJ, Torres revealed that this happened to him approximately eighty times. (R. at 234.) The seven-page affidavit that Torres filed in support of his written application for asylum, however, is silent about these occurrences. The second notable omission from Torres's written application is the series of mock executions performed at the hands of Colonel Martinez, in which Martinez would put an unloaded pistol to Torres's head and pull the trigger. The third omission is the occasions on which Martinez forced Torres to run nude in front of his comrades. Again, the written application and accompanying affidavit make no mention of these events.

For Torres's petition to succeed, these omitted events must be accepted as the basis of his claims. Torres's written

application generalizes about his mistreatment and focuses almost exclusively on his time in "the hole." As we acknowledged above, however, it appears from both Torres's affidavit and his testimony that Torres's time in the hole, while deplorable, was punishment for Torres's second escape attempt in the span of one week, not for being a member of the Flores Torres family. As such, this mistreatment lacks the requisite nexus to one of the five protected grounds and cannot form the basis of a successful asylum claim. *See Tamas-Mercea*, 222 F.3d at 425-26. Thus, if Torres is to succeed in his attempt for asylum, the three instances that were linked to his status as a Flores Torres brother and that were omitted from his written application—the water barrel torture, the mock executions, and the nude running—must serve as the foundation of his claims.

According to Torres's own testimony, these omitted incidents were examples of severe mistreatment. Fifteen times, Torres stated, medics had to revive him after pulling him from the water barrel. On multiple occasions Torres thought he was staring death in the face, only to hear the click of an empty chamber when Martinez pulled the trigger on the gun placed against Torres's temple. And one can only imagine the humiliation that must come from being forced to run, without clothes, alongside one's friends and comrades-in-arms. These events happened not once, not twice, but numerous times. Torres testified, for example, that Martinez subjected him to the water barrel torture on approximately eighty different occasions.

Our prior decisions have addressed the significance of omissions. In *Korniejew*, 371 F.3d 377, an immigration judge made an adverse credibility determination after a woman seeking asylum discussed certain instances of persecution in her affidavit but failed to mention them during her hearing. *Id.* at 381. We concluded that these were material omissions and upheld the IJ's decision. *Id.* at 384-85. We found several facts decisive in reaching that conclusion: (1) the omitted incident was the petitioner's most recent personal encounter with her persecutors; (2) the omitted incident involved physical injury to the petitioner; (3) the petitioner was held overnight during the omitted incident; (4) the omitted incident was important in petitioner's decision to flee her country; and (5) the petitioner did not offer a reasonable explanation for her failure to discuss the omitted incident during her hearing. *Id.*

We relied on our analysis in *Korniejew* as support for our later decision in *Shmyhelskyy v. Gonzales*, 477 F.3d 474 (7th Cir. 2007), which had facts even more analogous to those presented in this case. In *Shmyhelskyy*, as here, the petitioner provided an additional claim during his hearing that he did not discuss in his written application, an omission the immigration judge found critical in concluding that the petitioner's testimony was incredible. *Id.* at 479. In affirming the IJ's adverse credibility finding, we discussed the factors from *Korniejew* and focused most of our attention in two areas: first, the severity of the omitted beating, and second, the petitioner's inability to provide any explanation for his failure to allege the beating in his written application. *Id.* at 481.

In light of our analyses in *Korniejew* and *Shmyhelskyy*, we conclude that the three omissions in this case were significant. These were meaningful events during Torres's time in the Honduran military—incidents that strike at the very heart of Torres's claims. The mistreatment was severe. The occurrences were repetitive. These were the events, among others, that prompted Torres to flee. It only follows that these events should have been prevalent throughout not only Torres's testimony, but his written application as well. The IJ, notwithstanding his improper conduct throughout the hearing and his flawed analysis on several other points, was correct in using these omissions as one basis for his adverse credibility determination. Where the IJ once again failed, however, was in the next stage of the analysis.

When, as here, a petitioner for asylum is faced with an adverse credibility finding based on material inconsistencies or omissions, the petitioner may counter with "a convincing explanation of the discrepancies or extrinsic—and credible—corroborating evidence." *Capric*, 355 F.3d at 1086. At many junctures during his testimony, Torres provided explanations for the omissions from his application. Torres stated that he remained afraid of Martinez and that the omitted events had been humiliating. He was hesitant to discuss such humiliations with his attorney, who was nothing more than a stranger at the time she helped him construct his initial application and accompanying affidavit. As Torres explained during the hearings, only after he became more familiar with his attorney and began to trust her did he come forward with the additional information.

The IJ chose to disregard these explanations. The IJ, without additional justification, said only that "the respondent could not offer any persuasive reason as to why he had not detailed [these events] in his affidavit." (R. at 82.) In reviewing this conclusion, we return to our earlier finding that the IJ's conduct during the hearing tainted his analysis. Applying that finding to this situation, we conclude that the IJ's opinion that these explanations were unpersuasive is incurably tainted by his improper conduct during the hearing and prejudiced by his continued reliance on facts either immaterial to Torres's claims or derived from the ether of the IJ's imagination. *See Huang*, 403 F.3d at 950-51. Although we will generally defer to the weight an IJ gives to a proffered explanation, *see Georgis*, 328 F.3d at 970, we will not do so when the IJ's own conduct and flawed analysis serve to make the finding itself wholly unreliable.

### III. CONCLUSION

We conclude that the IJ's credibility determination was not based on "specific, cogent reasons that bear a legitimate nexus to the findings," *Huang*, 403 F.3d at 948 (internal quotation marks omitted), and was therefore in error. Accordingly, the decision to deny Torres's petition for asylum, withholding of removal, and protection under the Convention Against Torture was not supported by substantial evidence. We VACATE the BIA's order for voluntary departure and REMAND for further proceedings in accordance with this opinion. As we have done on prior occasions, *see, e.g.*, *Huang*, 403 F.3d at 951; *Lin*, 385

F.3d at 757-58; *Georgis*, 328 F.3d at 970; *Kerciku v. INS*, 314 F.3d 913, 919 (7th Cir. 2003), we encourage the BIA to assign a different judge to this case on remand, *cf.* Circuit Rule 36 of the United States Court of Appeals for the Seventh Circuit.