DENNIS, Circuit Judge,
dissenting:
I respectfully dissent. To show persecution “on account of’ a protected ground, 8 U.S.C. § 1101(a)(42)(A) “only ‘requires the alien to prove some nexus between the persecution and [one of] the five protected grounds.’ ” Thuri v. Ashcroft, 380 F.3d 788, 792 (5th Cir.2004) (quoting Ontunez-Tursios v. Ashcroft, 303 F.3d 341, 349 (5th Cir.2002)).[1] The evidence presented by Mrs. Demiraj in this case clearly demonstrates a nexus between the persecution she fears and the protected ground of membership in a social group, i.e., her membership in the family of Mr. Demiraj.
Bedini, an Albanian mobster, has shown himself to be a powerful person capable of brutal violence. Bedini previously threatened Mr. Demiraj for agreeing to aid the United States government in its investigation of his involvement in human smuggling, and, in March 2003, abducted Mr. Demiraj and his brother. Bedini and the other captors beat both men, and Bedini then shot Mr. Demiraj at close range. Although Mr. Demiraj survived, his physi *202 cian later told him that he was “lucky the bullet did not go through [his] kidney.” Although Mr. Demiraj requested help from the police, they refused to take any action against Bedini. Mr. Demiraj then escaped to the United States in April 2003, and was granted withholding of removal.
Besides this attack, Bedini has targeted other Demiraj family members because they are members of Mr. Demiraj’s family. In April 2003, several men, one of whom appears to have been Bedini, kidnapped two of the Demirajs’ nieces in Albania and took them to Italy, where the captors attempted to force the nieces — ages 19 and 21 — into prostitution. Upon being given clothes to wear for standing on the street, the girls began to cry and protest that they were not prostitutes. One captor, who may have been Bedini, became angry and beat the girls, saying that “this was payback to your [U]ncle Edmund [Mr. Demiraj] for when I was in the United States.” The captors then tied the nieces up for days with no food, water, or access to a toilet. Eventually, the nieces, who “both had pain all over, felt sick and nauseated,” and had urinated on themselves, consented to work as prostitutes. They were told to clean themselves up and to put on makeup. They were taken outside to the streets, where “[t]he same man ... who shot [their] Uncle Edmund” gave them “some condoms and told [the nieces] how to use them for sex.” Not long after-wards, the nieces, through sheer luck and a kind taxi driver, managed to escape from their captors and contact their family. Their family worried that if the nieces returned to Albania, Bedini would attack them again, and that the local police would refuse to intervene, as they had done after Mr. Demiraj was shot. The nieces then fled to the United States and were granted asylum.
Three years later, in 2006, Bedini and his associates abducted at gunpoint the nieces’ younger sister, who was 19 years old at the time, and took her to Germany. Bedini beat her, saying that he had “warned [her] sisters not to escape from us because their [the Demiraj] family was going to pay for everything,” and that “[n]ow you’re going to pay for your sisters and your uncle. You better don’t do the same as your sisters.” Like her sisters, this niece was taken to the streets for prostitution, but managed to escape, and fled to the United States, where she was granted asylum. In addition, the brother who was abducted with Mr. Demiraj has now fled to Greece, and Mr. Demiraj’s parents, who have been threatened by Bedini, have gone into hiding.
The majority characterizes all of this as involving merely personal revenge, but there is no evidence that Bedini has any grudge against Mrs. Demiraj, her son, or any other Demiraj family members as individuals — rather, his only interest in them is because of their membership in the family of Mr. Demiraj.
In Torres v. Mukasey, 551 F.3d 616 (7th Cir.2008), whose facts are markedly similar to those of the instant case, the Seventh Circuit explained that “[a] successful asylee must show that he was persecuted because of his ... membership in a particular social group,” and concluded that “the record shows that [the petitioner] clearly did establish ... a nexus” between his mistreatment and his family membership, where the petitioner presented evidence that he had been mistreated by the Honduran military because of his relationship to his brothers, who were considered military deserters. Id. at 629-30. The Seventh Circuit explained:
[The petitioner’s] testimony is rife with examples that provide his family’s history as the nexus for his mistreatment. Throughout the hearing, [the petitioner] *203 noted the numerous occasions on which ... his primary perseeutor[ ] referenced [the petitioner’s] family while inflicting harm on [the petitioner]. In at least one instance when [the persecutor] placed an unloaded pistol to [the petitioner’s] head and pulled the trigger, [the petitioner] testified that [the persecutor] said, “You are going to pay for your brothers’ desertion. You are going to pay for his escape because you are the last one that ... we ... have.” According to [the petitioner’s] testimony, [the persecutor] told [the petitioner] that he placed [the petitioner] in the water barrel because “I had to pay for the escape of my brothers.” [The petitioner] testified that when [the persecutor] forced [the petitioner] to run nude in front of his unit, [the persecutor] ordered, “Put this man to run until he falls dead .... Because you have to pay for what your brothers did for their escape because they violated. They defy the army.” [The petitioner] also stated, “I was so afraid that I was going to stay in [the army] and I was afraid to die in there. Because ... [the persecutor] told me that I was never going to leave that place .... Because I was going to pay for my brothers’ escape because I was the last one that remained.”
Id. at 630 (internal citations omitted). In this case, we have essentially the same situation: Mrs. Demiraj faces a grave risk of attack from Bedini if she returns to Albania because of her membership in the family of Mr. Demiraj. She married Mr. Demiraj in 1992 and, several years later, he agreed to aid the United States government in a criminal prosecution against Bedini, thereby exposing his family to the depredations of Bedini. Mrs. Demiraj’s family membership puts her at risk of attacks similar to what other family members have already experienced.
Accordingly, Mrs. Demiraj is entitled to protection under 8 U.S.C. § 1101(a)(42)(A), which grants asylum to persons who have a well-founded fear of persecution because of their membership in a particular social group:
To establish that he is a member of a “particular social group,” [the petitioner] must show that he was a member of a group of persons that share a common characteristic that they either cannot change or should not be required to change because it is fundamental to their individual identities or consciences.
Ontunez-Tursios, 303 F.3d at 352. The majority and the BIA do not dispute that membership in a family meets these criteria. Family membership is a characteristic that a person either cannot change (if he or she is related by blood) or should not be required to change (if he or she is related by marriage). The purpose of asylum law is to honor a moral obligation to protect people who are threatened with persecution because of characteristics like these. The Seventh Circuit applied the law correctly in Torres, a case that I find indistinguishable from the current case. The majority has created a circuit split and put our court on the wrong side of it. I therefore dissent.

. The REAL ID Act of 2005 changed the "on account of” language to the following: "To establish that the applicant is a refugee ... the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant.” 8 U.S.C. § 1158(b)(l)(B)(ii) (emphasis added). The BIA has held that this new standard applies not only to applications for asylum, but also to applications for withholding of removal. In re C-T-L-, 25 I. & N. Dec. 341, 344-48 (B.I.A.2010). However, the REAL ID Act applies "only prospectively to applications for asylum or withholding of removal made on or after the effective date of the Act, May 11, 2005.” Aligwekwe v. Holder, 345 Fed.Appx. 915, 920 n. 4 (5th Cir.2009) (unpublished) (citing REAL ID Act of 2005, Pub.L. No. 109-13, § 101(h), 119 Stat. 302, 305). Mrs. Demiraj’s application for asylum or withholding of removal was filed before 2005. Therefore, as the majority states, the REAL ID Act does not apply in this case.