# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 8, 2009

Charles R. Fulbruge III
Clerk

No. 08-60301

PAULINE EKEMMA ALIGWEKWE,

Petitioner,

v.

ERIC H. HOLDER, JR., U.S. ATTORNEY GENERAL

Respondent.

Petition for Review of an Order of the
Board of Immigration Appeals
BIA No. A98 542 582

Before BENAVIDES, DENNIS, and ELROD, Circuit Judges.

PER CURIAM:[*]

Petitioner Pauline Ekemma Aligwekwe, a native and citizen of Nigeria, was charged with being an alien remaining in the United States longer than permitted. An Immigration Judge (IJ) found her removable, denied her applications for asylum, withholding of removal, and relief under the Convention Against Torture (CAT), and ordered her removed. The Board of Immigration Appeals (BIA) dismissed her appeal of the IJ's order. Ms. Aligwekwe filed a petition for review of the BIA's decision.

---

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

## I. FACTUAL BACKGROUND

Ms. Aligwekwe's claims for asylum and related remedies revolve around her experiences as a Catholic nun in Nigeria. Ms. Aligwekwe, a native of Nigeria, entered the United States as a non-immigrant visitor on May 23, 2003, with authorization to remain no longer than May 18, 2004. Ms. Aligwekwe entered the convent in 1960 and joined the Congregation of the Immaculate Heart. She traveled abroad for her education and received a Ph.D. from the Sorbonne in Paris in 1980.

On a visit home from school in 1978, Ms. Aligwekwe met the priest who would later become bishop of her archdiocese, Anthony Ilonu. Two years later, she visited Bishop Ilonu to congratulate him on his studies. According to Ms. Aligwekwe, Bishop Ilonu allegedly disrobed and sexually propositioned her while showing her around his quarters. Ms. Aligwekwe testified that she left the room immediately and was later escorted back to her convent by the bishop.

In 1985, Ms. Aligwekwe resigned from the Immaculate Heart Congregation because she desired to start her own convent. According to canon law, the resignation caused her to revert to lay status. In 1992, she took early retirement from her job as a professor in order to devote herself fully to starting her new religious order. She attempted to start the convent outside her diocese, but several Nigerian bishops instructed her to return home. Over the course of the next five years, she continued to work towards establishing her order.

Church law required that Ms. Aligwekwe obtain a written charter from Bishop Ilonu before starting her new order; she asserts that Bishop Ilonu abused his position in this regard. Ms. Aligwekwe claims that Bishop Ilonu continued his sexual harassment while she was petitioning him for the charter, but acknowledges that he did not physically touch her other than massaging her hand. In 1997, Bishop Ilonu gave her verbal permission to open the new convent, but failed to provide the charter required by canon law. Ms. Aligwekwe

asserts that in 1999, Bishop Ilonu disbanded her order in retaliation for her resistance to his sexual advances and for reporting his sexual laxity to the Vatican.

On August 17, 2002, the convent Ms. Aligwekwe founded was attacked by seven armed men who have not yet been identified. The assailants broke into the convent, shot a statue present in the chapel, and injured the night watchman with a machete. Ms. Aligwekwe was not present at the convent on the night of the attack. She claims that Bishop Ilonu and his alleged girlfriend, Rosemary Uche, were behind the attack, but has presented no evidence of Bishop Ilonu's involvement. After the attack, Ms. Aligwekwe hid with friends and moved in with her sister before moving to the United States.

## II. PROCEEDINGS BELOW

### A. The Immigration Judge's First Decision

Ms. Aligwekwe applied for asylum and related remedies on July 20, 2004, two months after her authorized status expired. On November 2, 2004, Ms. Aligwekwe appeared before an IJ and conceded the factual allegations and acknowledged her removability under 8 U.S.C. § 1227(a)(1)(B). At her merits hearing in February 2005, Ms. Aligwekwe asserted that her asylum application was filed within a reasonable amount of time because she had hoped that her problems in Nigeria would resolve.

Before the IJ, Ms. Aligwekwe argued that she qualified for asylum and withholding of removal on the grounds that she was persecuted on account of her religion and her membership in a social group. Specifically, Ms. Aligwekwe claimed persecution because she practiced Catholicism as it "was supposed to be practiced as opposed to the way it was practiced by [Bishop Ilonu]." She asserted that her resistance to Bishop Ilonu's sexual harassment and her teaching against sexual abuse in the convent she founded also resulted in persecution. Ms. Aligwekwe also claimed persecution on account of her membership in a

particular social group, specifically "women religious in Nigeria who challenge a Catholic Bishop." Ms. Aligwekwe also petitioned for relief under the CAT on the grounds that she feared for her life after the attack on her convent and that the Nigerian government was unable or unwilling to protect her from Bishop Ilonu.

On February 25, 2008, the IJ rendered his initial decision, finding Ms. Aligwekwe credible, but nevertheless denying her applications for asylum and related remedies. As a preliminary matter, the IJ did not decide the question of whether Ms. Aligwekwe timely filed her claims. In support of his decision on the merits, the IJ noted that Bishop Ilonu's sexual harassment never went beyond propositioning her and touching her hand and thus did not rise to the level of persecution. Regarding the attack on her convent, the IJ found that there was no evidence indicating that the attack was carried out under the Bishop's orders. Furthermore, the IJ determined that Bishop Ilonu was not an official of the Nigerian government and that the petitioner had failed to demonstrate that any government official had prior knowledge of the attack and failed to stop it. The IJ concluded that this matter was a private dispute and could not serve as the proper basis for Ms. Aligwekwe's requests for asylum and related remedies.

On appeal to the BIA, Ms. Aligwekwe moved to remand based on previously unavailable evidence, including a website maintained by Bishop Ilonu's supporters that urged vengeance upon her. The BIA determined that this evidence was material and went to the heart of her claims. The Department of Homeland Security did not oppose her motion and the BIA remanded the case back to the IJ to take additional evidence.

**B. The Immigration Judge's Second Decision**

On remand, the IJ again denied Ms. Aligwekwe's claims and made several findings that differed from those of his original decision. First, the IJ concluded that Ms. Aligwekwe was not credible. The IJ based this conclusion on the fact

4

that she continued to call herself a Catholic nun despite the fact that the Vatican had revoked her status as a consecrated nun when she resigned from the Congregation of the Immaculate Heart. The IJ also found that she had distorted the sequence of the events in question. Finally, the IJ found that her asylum application was not timely filed and was frivolous.

Turning to Bishop Ilonu's sexual harassment, the IJ determined that the "proposition and subsequent hand petting" did not rise to the level of persecution. Furthermore, the IJ found that the bishop's conduct was not motivated in any way by Ms. Aligwekwe's religion; there was no evidence that the bishop ever attempted to change her religious beliefs about chastity and celibacy. Rather, the IJ concluded that Bishop Ilonu simply invited her to participate in an immoral act to satisfy his own desires. Furthermore, the IJ concluded that Ms. Aligwekwe's complaints against the bishop were not in any way declarations of her own faith, but were simply accusations of wrongful conduct.

With respect to the convent's closure, the IJ found that the record did not support Ms. Aligwekwe's claims of retaliation. The IJ pointed to an official letter from Cardinal Tomko indicating that the convent was in fact closed pursuant to a general order of the Provincial Council of Nigerian Bishops. This order required the closure of all religious societies that did not have written charters. The IJ concluded that this letter was the "best and most reliable evidence" as to why Ms. Aligwekwe's convent was closed. In addition, the IJ observed that Ms. Aligwekwe had not presented sufficient evidence to demonstrate that she was entitled to receive a charter and that her order fully complied with the requirements of the Catholic Church. Without such a showing, the IJ was unable to conclude that retaliation was the basis for the closure of her convent.

Regarding the attack on the convent, the IJ again found that there was no reliable evidence in the record that could link Bishop Ilonu to the attack. The

IJ observed that the bishop's alleged girlfriend, Rosemary Uche, did have a motive for instigating the attack, but that her motive was personal and therefore not a basis for asylum or withholding of removal. In addition, the IJ noted that these events took place within the Diocese of Okigwe and that the record did not establish that Ms. Aligwekwe could not relocate safely to other parts of Nigeria.

Finally, the IJ rejected Ms. Aligwekwe's arguments that she faced future persecution or torture at the hands of or with the acquiescence of government officials. The IJ stated that persecution, under the immigration laws, involves conduct by the government or private parties that it is unable or unwilling to control.[1] The IJ observed that cases involving persecution due to government inability to control are relatively rare and normally involve large terrorist groups or a complete breakdown of social order. The IJ characterized the instant case as involving the more common category of government unwillingness to control a private party. According to the IJ, a government need only take "responsible steps, within the limits of its resources to control the persecution . . . to show that [it] is willing to control the private party."[2]

The IJ separately analyzed Ms. Aligwekwe's claims that the governments of the Vatican and Nigeria were unwilling to control Bishop Ilonu. With respect to the Vatican, the IJ observed that it had no legal responsibility or authority to protect Ms. Aligwekwe from persecution in a foreign state. Turning to the Nigerian government, the IJ found that the police had conducted an investigation into the incident and sought the whereabouts of Rosemary Uche. The IJ discounted an e-mail sent by a reporter recounting the testimony of an unidentified seminarian who stated that the local police were on Bishop Ilonu's payroll and would kill Ms. Aligwekwe upon her return to Nigeria. According to

---

[1] *See In re: Villalta*, 20 I&N Dec. 142, 147 (BIA 1990); *In re: H*, 21 I&N Dec. 337 (BIA 1996).

[2] *See Elanger v. INS*, 930 F.2d 784, 788-89 (9th Cir. 1991).

the IJ, this e-mail was an unsubstantiated rumor at best. With respect to the threats posted on a website against Ms. Aligwekwe, the IJ again emphasized that Bishop Ilonu and Rosemary Uche were not government officials. Finally, the IJ found the bishop's retirement had rendered him even less formidable.[3] As such, the threats did not establish that it was more likely than not that Ms. Aligwekwe would be tortured with the acquiescence of a government official.

## C. The BIA's Decision

The BIA dismissed Ms. Aligwekwe's appeal on March 12, 2008. Before addressing the merits, the BIA first expressed its disagreement with several of the IJ's findings. First, the BIA determined that the two month delay in the filing of her application was not unreasonable and Ms. Aligwekwe filed a timely application. The BIA also disagreed with the IJ's adverse credibility ruling and found Ms. Aligwekwe credible. Finally, the BIA found that Ms. Aligwekwe's asylum application was not frivolous.

Nevertheless, the BIA affirmed the IJ's decision on the merits. The BIA held that even if Ms. Aligwekwe was assumed to be credible, Bishop Ilonu's sexual harassment did not rise to the level of persecution. With respect to the attack on the convent, the BIA agreed with the IJ that the motives and identity of the attackers remained unknown.

The BIA also rejected Ms. Aligwekwe's argument that the IJ was biased against her and she was deprived of her right to due process and a fair hearing. After reviewing the record, the BIA found no evidence of improprieties or deficiencies during the proceedings. The BIA concluded that Ms. Aligwekwe had been given a full opportunity to present the merits of her claim through oral testimony and written documentation.

---

[3] The record indicates that Bishop Ilonu actually resigned from his position.

## III. STANDARD OF REVIEW

This court normally reviews only the final decision of the BIA. *Zhu v. Gonzales*, 493 F.3d 588, 593 (5th Cir. 2007). When, as in the present case, the BIA's decision is affected by the IJ's ruling, however, this court also reviews the IJ's decision. *Id.* We review questions relating to our jurisdiction to consider challenges to a final order of the BIA *de novo. Balogun v. Ashcroft*, 270 F.3d 274, 277 (5th Cir. 2001). The same standard applies to constitutional claims and questions of law. *Mai v. Gonzales*, 473 F.3d 162, 164 (5th Cir. 2006). We review factual determinations under the substantial evidence standard and will not reverse the BIA's findings "unless the evidence is so compelling that no reasonable fact finder could fail to find otherwise." *Lopez-Gomez v. Ashcroft*, 263 F.3d 442, 444 (5th Cir. 2001) (internal quotations and citations omitted).

## IV. DISCUSSION

### A. Petitioner's Request for Asylum and Withholding of Removal

The burden of establishing eligibility for asylum rests with the alien, who must demonstrate past persecution or well-founded fear of future persecution on account of his race, religion, nationality, membership in a particular social group or political opinion. *Lopez-Gomez*, 263 F.3d at 444-45; *see also* 8 U.S.C. § 1101(a)(42)(a); 8 C.F.R. § 1208.13(a)-(b). We have construed the term "persecution" to mean "[t]he infliction of suffering or harm, under government sanction, upon persons who differ in a way regarded as offensive . . . in a manner condemned by civilized governments." *Abdel-Masieh v. I.N.S.*, 73 F.3d 579, 583 (5th Cir. 1996) (internal citations and quotations omitted). Persecution is normally limited to persecution "by authorities, supporters of the . . . regime, the military, or the government unless political conditions [in the alien's country of origin] are so specially oppressive that a wider range of claims of persecution must be given credence." *Adebisi v. I.N.S.*, 952 F.2d 910, 913-914 (5th Cir. 1992) (internal quotations and citations omitted). In addition, persecution does not

8

encompass "all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Majd v. Gonzales*, 446 F.3d 590, 595 (5th Cir. 2006) (internal citations and quotations omitted).

In cases where there may be mixed motives for the persecution, the applicant need not show past persecution or fear of future persecution solely on account of a protected ground, but must demonstrate that at least one of the persecutor's motives falls within a statutorily protected ground. *Girma v. I.N.S.*, 283 F.3d 664, 667 (5th Cir. 2002) (citing *Singh v. Ilchert*, 63 F.3d 1501, 1509 (9th Cir. 1995), *superseded by statute*, REAL ID ACT of 2005, Pub. L. No. 109-13, 119 Stat. 231).[4]

The test for withholding of removal differs from that for a discretionary grant of asylum. *I.N.S. v Cardoza-Fonseca*, 480 U.S. 421, 423-25 (1987). An alien seeking withholding of removal must demonstrate that it is more likely than not that her life or freedom would be threatened because of her race, religion, nationality, membership in a particular social group, or political opinion. *I.N.S. v Stevic*, 467 U.S. 407, 429-30 (1984).

There is evidence in the record that could support a finding that the petitioner has suffered considerable harm. Under our highly deferential standard of review, however, we cannot say that no reasonable fact finder could have concluded that her suffering was not inflicted under government sanction. *See Zhao v. Gonzales*, 404 F.3d 295, 307 (5th Cir. 2005); *see also Abdel-Masieh*,

---

[4] As the respondent notes in its brief to this court, since this case began, Congress passed the REAL ID Act, which amended a number of provisions of the INA regarding asylum, and superseded the mixed motive analysis set forth in *Singh,* 63 F.3d 1501, and subsequently *Girma,* 283 F.3d 664. *See* REAL ID Act, Pub. L. No. 109-13, § 101(a)(3)(B)(I), 119 Stat. 231, 303 (2005) *codified at* 8 U.S.C. § 1158(b)(1)(B)(i). However, other than a provision regarding the standard of review for determinations regarding the availability of corroboration, these changes apply only prospectively to applications for asylum or withholding of removal made on or after the effective date of the Act, May 11, 2005 and are therefore inapplicable to this case. *See* REAL ID Act § 101(h). Thus, the mixed motive analysis used in *Girma* and *Borja* remains valid for this case.

73 F.3d at 583. The IJ found that neither Bishop Ilonu nor Rosemary Uche were state officials and nothing in the record would compel us to reverse this finding.

The IJ also determined that Ms. Aligwekwe had not suffered persecution at the hands of private parties that the government was unwilling to control. Citing two cases from the 9th Circuit,[5] the IJ concluded that as long as a government is taking reasonable steps to protect its citizens from harm in question, such efforts are sufficient to defeat a claim that it is either unable or unwilling to control private parties. We agree with this reasoning. According to the IJ, the fact that the police interviewed the petitioner and subsequently published a "wanted person notice" indicated that efforts were being made to investigate the attack. The BIA upheld these findings and the evidence in the record does not compel us to reverse them.

The IJ also found that the evidence presented by Ms. Aligwekwe was unreliable and did not establish that Nigeria was unable or unwilling to enforce its laws. The IJ noted that the e-mail from Mr. George Osodi of the Associated Press contained no explanation as to how his source knew that the police were on Bishop Ilonu's payroll. Consequently, the IJ viewed it as providing nothing more than an unsubstantiated rumor. The IJ likewise discounted the threats posted on the website by the bishop's supporters, again referencing the fact that Bishop Ilonu was not a government official. The BIA also agreed with these findings and we will not reverse them.

## B. Petitioner's Request for Relief under the Convention Against Torture

A claim for relief under the CAT is distinct from requests for asylum and withholding of removal. *See Roy v. Ashcroft*, 389 F.3d 132, 139 (5th Cir. 2004). We likewise review claims for relief under the CAT under the substantial evidence standard. *See Chen v. Gonzales*, 470 F.3d 1131, 1134 (5th Cir. 2006).

---

[5] *See Castro-Perez v. Gonzales*, 409 F.3d 1069 (9th Cir. 2005); *Elanger v. I.N.S.*, 930 F.2d 784 (9th Cir. 1991);

In order to obtain relief under the CAT, a petitioner must demonstrate that it is "more likely than not" that she would be tortured if removed to the proposed country. 8 C.F.R. § 1208.16(c)(2). Unlike the laws relating to asylum and withholding of removal, the "CAT regulations do not require that the reason for the torture fall within one of the five categories of race, religion, nationality, membership in a particular social group, or political opinion." *Efe v. Ashcroft*, 293 F.3d 899, 907 (5th Cir. 2002). However, a petitioner must demonstrate that she faces the threat of torture as opposed to mere persecution. *Id.* Federal law defines torture as:

> . . .[A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1).

The governing regulations provide that "all evidence relevant to the possibility of torture shall be considered." 8 C.F.R. § 1208.16(c)(3). In addition, the regulations establish that a public official must have knowledge of the activity constituting torture beforehand and breach a legal duty to intervene before he is deemed to have acquiesced in the torture. § 1208.18(a)(7).

Petitioner's claims for relief under the CAT fail for the same reasons as her claims for asylum and withholding of removal. As we explained above, there is no evidence that would compel us to reverse the BIA's finding that the harm to Ms. Aligwekwe was not conducted under government sanction. Likewise, we will not reverse the BIA's determination that there was no evidence that the

petitioner would be tortured by or with the acquiescence of the Nigerian government upon her return.

## C. Petitioner's Claims of Denial of Due Process

The Due Process Clause entitles aliens to due process in immigration proceedings and a hearing before a fair and impartial arbiter. *See Ojeda-Terrazas v. Ashcroft*, 290 F.3d 292, 302 (5th Cir. 2002). In raising a due process challenge before this court, an alien must demonstrate that she has suffered substantial prejudice. *Calderon-Ontiveros v. I.N.S.*, 809 F.2d 1050, 1052 (5th Cir. 1986). To the extent that the petitioner raises a due process challenge based on denial of discretionary relief, this court has held that such challenges do not touch on a constitutionally protected liberty or property interest. *See Ahmed v. Gonzales*, 447 F.3d 433, 440 (5th Cir. 2006) (citations omitted).

On appeal, Ms. Aligwekwe argues that the IJ was biased, largely on the grounds that he made adverse evidentiary findings. She fails to demonstrate any error with the BIA's conclusion that she suffered no prejudice as a result of the numerous violations she claims. The BIA found that the IJ's decision was supported by substantial evidence, a conclusion that we have affirmed. With respect to the conduct of the proceedings, Ms. Aligwekwe alleges deficiencies in the proceedings that prevented her from presenting important testimony, but provides no explanation for how this testimony would have affected the outcome of the proceedings. As such, she has failed to demonstrate substantial prejudice. *See Calderon-Ontiveros*, 809 F.2d at 1052.

To the extent that Ms. Aligwekwe argues that the agency did not address her arguments, her claims are also without merit. The court does not require the BIA to "address every evidentiary minutiae or write any lengthy exegesis." *Abdel-Masieh v. I.N.S.*, 73 F.3d 579, 585 (5th Cir. 1996) (internal citations omitted). Rather, the agency's decision must "reflect meaningful consideration

of the relevant evidence." *Id.* We conclude that the BIA and the IJ gave such consideration to the evidence in the record. Accordingly, we conclude that the petitioner has failed to show that she was denied due process in her immigration proceedings.

**D. Issues raised for the first time on appeal**

The petitioner raises two issues for the first time on appeal: the introduction of new evidence and a request for voluntary departure. First, we are unable to consider materials outside the record upon which the BIA based its decision. *See* 8 U.S.C. § 1252(b)(4)(A) ("The court of appeals shall decide the petition only on the administrative record on which the order of removal is based."). With respect to her request for voluntary departure, we conclude that we are without jurisdiction to hear this claim, as the petitioner did not request such relief before the IJ and has thus failed to exhaust the administrative remedies available to her. *See Roy v. Ashcroft*, 389 F.3d 132, 136 (5th Cir. 2004) ("Failure to exhaust an issue creates a jurisdictional bar to that issue.") (internal citation omitted); *see also Gonzales v. Thomas*, 547 U.S. 183 (2006). We lack jurisdiction to grant a voluntary departure in the first instance; discretion to grant such a request is committed to the Attorney General. *See* 8 U.S.C. § 1229c(a)(1); *see also Vidal v. Gonzales*, 491 F.3d 250, 252 (5th Cir. 2007); *Eyoum v I.N.S.,* 125 F.3d 889, 891 (5th Cir. 1997).

For the foregoing reasons, Aligwekwe's petition for review is DENIED.