# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
January 11, 2011

Lyle W. Cayce
Clerk

Nos. 08-60991

---

RUDINA DEMIRAJ; REDIOL DEMIRAJ,

Petitioners

v.

ERIC H. HOLDER, JR., U. S. ATTORNEY GENERAL,

Respondent

---

Petitions for Review of Orders of the
Board of Immigration Appeals

---

Before BARKSDALE, DENNIS, and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:

Rudina Demiraj and her son, Rediol Demiraj, petition for review of the decision of the Board of Immigration Appeals ("BIA") denying their applications for asylum, withholding of removal, and protection under the Convention Against Torture.  The petitioners, who are Albanian nationals, are the wife and son of Edmond Demiraj, a material witness in the United States' prosecution of Bill Bedini.  While conceding removability, the petitioners contend that they reasonably fear reprisal from Bedini and his associates if they are returned to Albania.

While the petitioners have assembled competent record evidence of the risks they may face upon returning to Albania, we, like the Immigration Judge

Nos. 08-60991

("IJ") and the BIA, nevertheless conclude that those concerns do not entitle them to the relief they seek under the Immigration and Nationality Act. We therefore DENY the petition for review.

## I. Facts & Procedural History

Rudina Demiraj and her minor son, Rediol, entered the United States without inspection in October 2000. Mrs. Demiraj timely filed an application for asylum, withholding of removal, and protection under article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture"), Dec. 10, 1984, S. TREATY DOC. No. 100-20, 1465 U.N.T.S. 85, 113. Mrs. Demiraj named Rediol as a derivative beneficiary of her application. In her application, filed on September 28, 2001, and refiled as corrected on November 19, 2001, Mrs. Demiraj asserted that she was entitled to the relief requested because of her and her family's political involvement in opposing Albania's former communist regime and current socialist party and consequent fear of reprisal and torture in Albania.[1] On December 27, 2001, the Immigration and Naturalization Service issued Mrs. Demiraj and her son a notice to appear, charging her with removability; after a hearing before an IJ in 2002, Mrs. Demiraj and her son were denied all relief and ordered removed. Mrs. Demiraj appealed to the BIA, claiming that the court's interpreter was ineffective; the BIA dismissed the appeal in October 2003.

In February 2004, the BIA allowed Mrs. Demiraj to reopen her case based on changed circumstances. After the IJ's initial disposition of Mrs. Demiraj's case, Mr. Demiraj was shot in Albania by Bill Bedini, an Albanian wanted in the

---

[1] Mrs. Demiraj and her son originally were named in Mr. Demiraj's application for the same relief, but she elected to separate her and her son's applications and to refile them separately.

Nos. 08-60991

United States for human smuggling.[2]  Mr. Demiraj had been identified by the United States as a material witness against Bedini, but Mr. Demiraj never actually testified against Bedini because Bedini fled to Albania.  After Mr. Demiraj was deported to Albania, Bedini kidnaped, beat, and shot Mr. Demiraj because of his cooperation with the United States' efforts to prosecute Bedini. After Mr. Demiraj recovered from the shooting, local police in Albania took his statement but intimated that they would not investigate the crime.  Bedini threatened Mr. Demiraj again, and he fled to the United States.  Mr. Demiraj was granted withholding of removal in a separate proceeding.[3]  During the same time period, two of Mr. Demiraj's nieces were also kidnaped by Bedini and his associates and trafficked to Italy.  After escaping, the nieces fled to the United States and were granted asylum.

These new facts, along with evidence of the interfamilial "blood feud" culture in Albania, were presented to the IJ following the BIA's order to reopen Mrs. Demiraj's proceedings.  The IJ credited all of the testimony presented by Mrs. Demiraj but found nevertheless that she was not entitled to any of the relief she sought.  The IJ therefore ordered Mrs. Demiraj and her son deported to Albania.  The BIA dismissed the appeal in November 2006, adopting and affirming the decision of the IJ.  Mrs. Demiraj petitioned this court for review, but before we issued a decision, the Attorney General moved for voluntary remand to the BIA for reconsideration in light of the Supreme Court's intervening decision in *Gonzales v. Thomas*, 547 U.S. 183 (2006).  We granted

---

[2] The IJ ultimately accepted all of Mr. and Mrs. Demiraj's testimony with respect to the Bedini incidents as factually credible, and the BIA accepted that determination; we therefore recite it here as fact.

[3] We note that withholding of removal, unlike asylum, does not confer any derivative benefits or protections on the alien's family.  *Arif v. Mukasey*, 509 F.3d 677, 682 (5th Cir. 2007) (per curiam).

3

Nos. 08-60991

that motion and remanded. *Demiraj v. Gonzales*, No. 06-61125, slip op. at 1 (5th Cir. June 18, 2007).

On remand, the BIA applied *Thomas* but again dismissed the appeal in October 2008. Mrs. Demiraj filed a second petition for review with this court and moved to reconsider before the BIA, offering additional evidence that another of Mr. Demiraj's nieces had been granted asylum in the United States after Bedini kidnaped her and told her she would "pay" for the actions of her "sisters and her uncle." We stayed proceedings until the BIA denied the motion to reconsider in July 2009; Mrs. Demiraj also filed a third petition for review of the order denying reconsideration.

Mrs. Demiraj's petitions for review of the BIA's October 2008 decision on remand and of its July 2009 denial of reconsideration were timely filed. We have jurisdiction under 8 U.S.C. § 1252(b) and (d).

## II. Standard of Review

The BIA's interpretation of statutory and regulatory provisions that determine whether a petitioner is statutorily eligible for relief from removal is an issue of law that we review de novo. *See Ontunez-Tursios v. Ashcroft*, 303 F.3d 341, 348 (5th Cir. 2002) (reviewing statutory eligibility for asylum); *Shaikh v. Holder*, 588 F.3d 861, 863–64 (5th Cir. 2009) (reviewing statutory eligibility for withholding of removal); *Efe v. Ashcroft*, 293 F.3d 899, 906–07 (5th Cir. 2002) (reviewing eligibility for protection under the Convention Against Torture). In that de novo review, we "afford considerable 'deference to the BIA's interpretation of immigration statutes unless the record reveals compelling evidence that the BIA's interpretation is incorrect.'" *Shaikh*, 588 F.3d at 863 (quoting *Mikhael v. INS*, 115 F.3d 299, 302 (5th Cir. 1997)).

We review the BIA's underlying findings of fact "for substantial evidence, which 'requires only that the BIA's decisions be supported by record evidence and be substantially reasonable.'" *Shaikh*, 588 F.3d at 863 (citing *Mikhael*, 115

4

Nos. 08-60991

F.3d at 302, and quoting *Omagah v. Ashcroft*, 288 F.3d 254, 258 (5th Cir. 2002)); *see also* 8 U.S.C. § 1252(b)(4)(B).  Where, as here, the BIA's decision depended in large part on the factual findings of the IJ, we review the IJ's findings under this same standard to the extent that they influenced or were relied upon by the BIA.  *See Chun v. INS*, 40 F.3d 76, 78 (5th Cir. 1994).

## III.  Discussion

Mrs. Demiraj and her son asserted three grounds for relief from removal before the IJ and the BIA: (1) asylum, (2) withholding of removal based on a probability of persecution, and (3) protection under the Convention Against Torture.  The IJ and the BIA ruled that the petitioners were ineligible for any of the three forms of relief.  Asylum and withholding of removal based on a probability of persecution are closely related, and the BIA found the petitioners statutorily ineligible for relief under both for the same reason; we therefore address those claims together.[4]

### A.   *Asylum & Withholding of Removal*

The BIA found the petitioners ineligible for asylum or withholding of removal because, even crediting all of the petitioners' evidence, Mrs. Demiraj and her son could not demonstrate that any persecution they might suffer in Albania was "on account of" their membership in the Demiraj family within the meaning of the statute and regulation.  An alien who is otherwise subject to removal is eligible for discretionary asylum if the alien demonstrates that she is a "refugee" as defined under the Immigration and Nationality Act ("INA").  8 U.S.C. § 1158(b)(1)(A); *see also* 8 C.F.R. § 1208.13(b).  The statute in turn defines "refugee" in relevant part as a person who is unable or unwilling to return to her home county "because of persecution or a well-founded fear of persecution on

---

[4] The standards for relief are structured such that an applicant who cannot meet the persecution standard for asylum necessarily cannot meet the persecution standard for withholding of removal.  *See, e.g.*, *Efe*, 293 F.3d at 906.

Nos. 08-60991

account of . . . membership in a particular social group . . . ." 8 U.S.C.
§ 1101(a)(42)(A). Similarly, an alien may obtain withholding of removal if she
proves that her "life or freedom would be threatened in th[e] country [to which
removal is ordered] because of the alien's . . . membership in a particular social
group . . . ." 8 U.S.C. § 1231(b)(3)(A). The petitioners argue that they would be
persecuted in Albania by Bedini "on account of" their membership in a particular
social group, namely, the Demiraj family. The BIA, in its order after voluntary
remand, agreed with the petitioners that the "Demiraj family" could constitute
a "particular social group" within the meaning of the asylum and withholding of
removal statutes, and the government does not dispute that conclusion.

The core of this case instead is the question of whether Mrs. Demiraj's
evidence showed that she reasonably feared persecution or likely would be
persecuted "on account of" her family membership.[5] *See Thuri v. Ashcroft*, 380
F.3d 788, 792 (5th Cir. 2004). The IJ and the BIA concluded that the evidence
did not establish this requisite connection between her family membership and
the identified persecution by Bedini and his associates. The only dispute
between the parties is whether the facts as found by the IJ constitute, as a
matter of law, proof of persecution "on account of" Mrs. Demiraj's membership
in the Demiraj family or not.

After considering the record and the case law, the BIA explained its
conclusion thus:

> Nexus may be shown . . . where there is a desire [by the alleged or
> feared persecutor] to punish membership in the particular social

---

[5] Because Mrs. Demiraj's application for asylum was submitted before the effective
date of the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 302, she "had only to
demonstrate that 'one of the persecutor's motives [fell] within a statutorily protected ground.'"
*Shaikh*, 588 F.3d at 864 (alteration in original) (quoting *Girma v. INS*, 283 F.3d 664, 667 (5th
Cir. 2002)). By contrast, in cases decided "under the REAL ID Act, an alien must 'establish
that race, religion, nationality, membership in a particular social group, or political opinion
was or will be at least *one central reason for persecuting* the applicant.'" *Shaikh*, 588 F.3d at
864 (quoting 8 U.S.C. § 1158(b)(1)(A)); *see also* REAL ID Act § 101(a)(3), 119 Stat. at 303.

6

group, [and] also where there is a desire [by the persecutor] to overcome what is deemed to be an offensive characteristic identifying the particular social group. The respondents here [viz., Mrs. Demiraj and her son] must identify some evidence, direct or circumstantial, that the assailants are motivated, at least in part, by a desire to punish or to overcome the family relationship to [Mrs. Demiraj]'s husband.

Here, the individuals involved were seeking revenge against [Mr. Demiraj] for his testimony, and seek to harm [him] by attacking the respondents. We do not ordinarily find that acts motivated solely by criminal intent, personal vendettas, or personal desires for revenge establish the required nexus. . . . On this record, although the respondents are members of a particular social group, we do not find they fear persecution on account of this membership. Rather, the problems they may face are on account of revenge the assailants are attempting to extract against [Mr. Demiraj].

*In re Demiraj*, Nos. A095 218 801 & 802, slip op. at 2–3 (B.I.A. Oct. 14, 2008) (internal citations omitted).

The parties disagree about the meaning of "on account of." We need not resolve that dispute here because, even assuming that the petitioners' definition—"because of"—is the correct one, they cannot prevail. The crucial finding here is that the record discloses no evidence that Mrs. Demiraj would be targeted for her membership in the Demiraj family *as such*. Rather, the evidence strongly suggests that Mrs. Demiraj, her son, and Mr. Demiraj's nieces were targeted because they are people who are important to Mr. Demiraj—that is, because hurting them would hurt Mr. Demiraj. No one suggests that distant members of the Demiraj family have been systematically targeted as would be the case if, for example, a persecutor sought to terminate a line of dynastic succession. Nor does the record suggest that the fact of Mr. and Mrs. Demiraj's marriage and formal inclusion in the Demiraj family matters to Bedini; that is, Mrs. Demiraj would not be any safer in Albania if she divorced Mr. Demiraj and renounced membership in the family, nor would she be any safer if she were Mr.

Nos. 08-60991

Demiraj's girlfriend of many years rather than his wife. The record here discloses a quintessentially personal motivation, not one based on a prohibited reason under the INA.[6] Thus, the record in this case does not compel us to reject the BIA's determination here. Mrs. Demiraj and her son are not entitled to asylum or withholding of removal.

### B.     *Convention Against Torture*

The United States' implementation of the article 3 "non-refoulement" provision of the Convention Against Torture entitles an alien to withholding of removal if she can "establish that it is more likely than not that . . . she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2); *see also Tamara-Gomez v. Gonzales*, 447 F.3d 343, 350 (5th Cir. 2006) ("To obtain relief under the Convention Against Torture, the alien need not demonstrate all of the elements of a persecution claim; instead he must show a likelihood of torture upon return to his homeland."). The regulation defines "torture" as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or

---

[6] For this reason, our decision does not conflict with the Seventh Circuit's decision in *Torres v. Mukasey*, 551 F.3d 616 (7th Cir. 2008). *Torres* held that a petitioner had successfully demonstrated persecution on account of membership in his family where he had been singled out for extreme mistreatment while enlisted in the Honduran army simply because, "within Honduran military circles[,] the Flores Torres clan is known as a family of deserters." *Id.* at 622. The Seventh Circuit characterized the persecution of the petitioners in that proceeding as retribution "for the perceived offenses of his four brothers," *id.* at 623, but the facts of that case make quite clear that the petitioner's persecutors in the Honduran military had generalized their resentment of the brothers for desertion into a vengeful hatred of an entire family as a group of deserters. *See id.* at 623–24. Here, by contrast, the IJ and BIA determined that Bedini was motivated by personal revenge; that is, that Mrs. Demiraj is at risk because Bedini seeks to hurt Mr. Demiraj by hurting her—not because he has a generalized desire to hurt the Demiraj family as such. That finding has support in the record, and we are therefore obliged to defer to it. *See, e.g.*, *Shaikh*, 588 F.3d at 863.

8

intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1).

In this case, the IJ found Mrs. Demiraj's proof of "consent or acquiescence [by] a public official" lacking. A state actor only "acquiesces" in torture if "the public official, prior to the activity constituting torture, ha[s] awareness of such activity and thereafter breach[es] his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7); *see also Hakim v. Holder*, — F.3d —, No. 09-60549, 2010 WL 5064379, at *4–6 (5th Cir. Dec. 13, 2010) (holding that "'acquiescence' is satisfied by a government's willful blindness of torturous activity"). We have thus held that "relief under the Convention Against Torture requires a two part analysis—first, is it more likely than not that the alien will be tortured upon return to his homeland; and second, is there sufficient state action involved in that torture." *Tamara-Gomez*, 447 F.3d at 350–51 (footnote omitted).

The BIA adopted the IJ's opinion with respect to the Convention Against Torture and provided no independent analysis of that issue. The IJ concluded that Mrs. Demiraj had not demonstrated that she would more likely than not be tortured with the consent or acquiescence of the Albanian government. The IJ found that:

> [a]lthough the police in Albania apparently, assuming that [Mrs. Demiraj]'s information is correct, are reluctant to get involved with [her] problems with Be[d]ini and his associates, there is no evidence that the government of Albania has a policy of ignoring torture if they are specifically aware of [its] occurrence at the time it is occurring and also there is no evidence that [Mrs. Demiraj and her son] would be detained on behalf of the government and subjected to torture with the government's acquiescence.

Nos. 08-60991

We decline to disturb this finding. We may only reject the finding of fact that Mrs. Demiraj was not likely to be tortured "if the evidence presented by [the petitioner] was such that a reasonable factfinder would have to conclude that" the finding was incorrect. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *see also Chen v. Gonzales*, 470 F.3d 1131, 1134 (5th Cir. 2006) (holding that the standard of review under § 1252(b)(4)(B) "essentially codifies the substantial evidence test established by the Supreme Court in . . . *Elias-Zacarias*"). Mrs. Demiraj only presented evidence that her husband had difficulty convincing the local police to investigate his shooting after the fact. The standard for acquiescence, as the IJ's finding emphasizes, requires an official to be aware of ongoing torture and likely to refuse to act to intervene and prevent the torture as it is occurring.[7]  No such evidence was presented here.

The 2003 State Department Country Report on Albania, which was in evidence before the IJ, estimated that "60 to 65 percent" of what it termed "blood feud" homicides "were brought to court and nearly all of them ended up at the appellate level." The portion of that report that expressly assesses the country's record on torture noted occasional incidents of torture committed by public officials and described most as having been investigated and prosecuted. The IJ therefore had sufficient record evidence to conclude that the state was not "more likely than not" to acquiesce in torture and therefore also to deny relief under that treaty.

---

[7] Our recent decision in *Hakim* clarifying the definition of "willful blindness" similarly continues to require at least "awareness" on the part of the government. 2010 WL 5064379, at *5–6 (citing and quoting *Zheng v. Ashcroft*, 332 F.3d 1186, 1194–96 (9th Cir. 2003) (rejecting BIA's former standard for acquiescence because "the BIA's interpretation . . . impermissibly requires *more than awareness*" (emphasis added))).

Nos. 08-60991

## IV.  Conclusion

We find no error in the BIA's conclusion that the petitioners are not entitled to asylum, withholding of removal under the INA, or protection under the Convention Against Torture.  We therefore must DENY the petitions.

Nos. 08-60991

DENNIS, Circuit Judge, dissenting.

I respectfully dissent. To show persecution "on account of" a protected ground, 8 U.S.C. § 1101(a)(42)(A) "only 'requires the alien to prove *some* nexus between the persecution and [one of] the five protected grounds.'" *Thuri v. Ashcroft*, 380 F.3d 788, 792 (5th Cir. 2004) (quoting *Ontunez-Tursios v. Ashcroft*, 303 F.3d 341, 349 (5th Cir. 2002)).[1] The evidence presented by Mrs. Demiraj in this case clearly demonstrates a nexus between the persecution she fears and the protected ground of membership in a social group, i.e., her membership in the family of Mr. Demiraj.

Bedini, an Albanian mobster, has shown himself to be a powerful person capable of brutal violence. Bedini previously threatened Mr. Demiraj for agreeing to aid the United States government in its investigation of his involvement in human smuggling, and, in March 2003, abducted Mr. Demiraj and his brother. Bedini and the other captors beat both men, and Bedini then shot Mr. Demiraj at close range. Although Mr. Demiraj survived, his physician later told him that he was "lucky the bullet did not go through [his] kidney." Although Mr. Demiraj requested help from the police, they refused to take any action against Bedini. Mr. Demiraj then escaped to the United States in April 2003, and was granted withholding of removal.

---

[1] The REAL ID Act of 2005 changed the "on account of" language to the following: "To establish that the applicant is a refugee . . . the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be *at least one central reason* for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(ii) (emphasis added). The BIA has held that this new standard applies not only to applications for asylum, but also to applications for withholding of removal. *In re C-T-L-*, 25 I. & N. Dec. 341, 344-48 (B.I.A. 2010). However, the REAL ID Act applies "only prospectively to applications for asylum or withholding of removal made on or after the effective date of the Act, May 11, 2005." *Aligwekwe v. Holder*, 345 F. App'x 915, 920 n.4 (5th Cir. 2009) (unpublished) (citing REAL ID Act of 2005, Pub. L. No. 109-13, § 101(h), 119 Stat. 302, 305). Mrs. Demiraj's application for asylum or withholding of removal was filed before 2005. Therefore, as the majority states, the REAL ID Act does not apply in this case.

Nos. 08-60991

Besides this attack, Bedini has targeted other Demiraj family members because they are members of Mr. Demiraj's family.  In April 2003, several men, one of whom appears to have been Bedini, kidnapped two of the Demirajs' nieces in Albania and took them to Italy, where the captors attempted to force the nieces — ages 19 and 21 — into prostitution.  Upon being given clothes to wear for standing on the street, the girls began to cry and protest that they were not prostitutes.  One captor, who may have been Bedini, became angry and beat the girls, saying that "this was payback to your [U]ncle Edmund [Mr. Demiraj] for when I was in the United States." The captors then tied the nieces up for days with no food, water, or access to a toilet.  Eventually, the nieces, who "both had pain all over, felt sick and nauseated," and had urinated on themselves, consented to work as prostitutes.  They were told to clean themselves up and to put on makeup. They were taken outside to the streets, where "[t]he same man . . . who shot [their] Uncle Edmund" gave them "some condoms and told [the nieces] how to use them for sex."  Not long afterwards, the nieces, through sheer luck and a kind taxi driver, managed to escape from their captors and contact their family.  Their family worried that if the nieces returned to Albania, Bedini would attack them again, and that the local police would refuse to intervene, as they had done after Mr. Demiraj was shot.  The nieces then fled to the United States and were granted asylum.

Three years later, in 2006, Bedini and his associates abducted at gunpoint the nieces' younger sister, who was 19 years old at the time, and took her to Germany.  Bedini beat her, saying that he had "warned [her] sisters not to escape from us because their [the Demiraj] family was going to pay for everything," and that "[n]ow you're going to pay for your sisters and your uncle.  You better don't do the same as your sisters."  Like her sisters,

13

Nos. 08-60991

this niece was taken to the streets for prostitution, but managed to escape, and fled to the United States, where she was granted asylum. In addition, the brother who was abducted with Mr. Demiraj has now fled to Greece, and Mr. Demiraj's parents, who have been threatened by Bedini, have gone into hiding.

The majority characterizes all of this as involving merely personal revenge, but there is no evidence that Bedini has any grudge against Mrs. Demiraj, her son, or any other Demiraj family members as individuals — rather, his only interest in them is because of their membership in the family of Mr. Demiraj.

In *Torres v. Mukasey*, 551 F.3d 616 (7th Cir. 2008), whose facts are markedly similar to those of the instant case, the Seventh Circuit explained that "[a] successful asylee must show that he was persecuted because of his . . . membership in a particular social group," and concluded that "the record shows that [the petitioner] clearly did establish . . . a nexus" between his mistreatment and his family membership, where the petitioner presented evidence that he had been mistreated by the Honduran military because of his relationship to his brothers, who were considered military deserters. *Id.* at 629-30. The Seventh Circuit explained:

> [The petitioner's] testimony is rife with examples that provide his family's history as the nexus for his mistreatment. Throughout the hearing, [the petitioner] noted the numerous occasions on which . . . his primary persecutor[] referenced [the petitioner's] family while inflicting harm on [the petitioner]. In at least one instance when [the persecutor] placed an unloaded pistol to [the petitioner's] head and pulled the trigger, [the petitioner] testified that [the persecutor] said, "You are going to pay for your brothers' desertion. You are going to pay for his escape because you are the last one that . . . we . . . have." According to [the petitioner's] testimony, [the persecutor] told [the petitioner] that he placed [the petitioner] in the water barrel because "I had to pay for the

14

> escape of my brothers." [The petitioner] testified that when [the
> persecutor] forced [the petitioner] to run nude in front of his unit,
> [the persecutor] ordered, "Put this man to run until he falls
> dead. . . . Because you have to pay for what your brothers did for
> their escape because they violated. They defy the army." [The
> petitioner] also stated, "I was so afraid that I was going to stay in
> [the army] and I was afraid to die in there. Because . . . [the
> persecutor] told me that I was never going to leave that place. . . .
> Because I was going to pay for my brothers' escape because I was
> the last one that remained."

*Id.* at 630 (internal citations omitted). In this case, we have essentially the same situation: Mrs. Demiraj faces a grave risk of attack from Bedini if she returns to Albania because of her membership in the family of Mr. Demiraj. She married Mr. Demiraj in 1992 and, several years later, he agreed to aid the United States government in a criminal prosecution against Bedini, thereby exposing his family to the depredations of Bedini. Mrs. Demiraj's family membership puts her at risk of attacks similar to what other family members have already experienced.

Accordingly, Mrs. Demiraj is entitled to protection under 8 U.S.C. § 1101(a)(42)(A), which grants asylum to persons who have a well-founded fear of persecution because of their membership in a particular social group:

> To establish that he is a member of a "particular social group,"
> [the petitioner] must show that he was a member of a group of
> persons that share a common characteristic that they either
> cannot change or should not be required to change because it is
> fundamental to their individual identities or consciences.

*Ontunez-Tursios*, 404 F.3d at 352. The majority and the BIA do not dispute that membership in a family meets these criteria. Family membership is a characteristic that a person either cannot change (if he or she is related by blood) or should not be required to change (if he or she is related by marriage). The purpose of asylum law is to honor a moral obligation to

protect people who are threatened with persecution because of characteristics like these.  The Seventh Circuit applied the law correctly in *Torres*, a case that I find indistinguishable from the current case.  The majority has created a circuit split and put our court on the wrong side of it.  I therefore dissent.